# EXHIBIT "A"

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

SOUTHERN _____ District of _____ NEW YORK

RAND PUBLISHING COMPANY INC.

V.

VENTURETEK, L.P., RICHARD ELKIN,
ANTOINE BERNHEIM, STACY BERNHEIM
and GENSTAR, LTD.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

**'07 CIV 9596**

**JUDGE MARRERO**

TO: (Name and address of Defendant)
VENTURETEK, L.P.
c/o DAVID SELENGUT, ESQ.
ELLENOFF GROSSMAN & SCHOLE LLP
370 LEXINGTON AVENUE
NEW YORK, NY 10017-6503

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

FRANCIS CARLING, ESQ.
COLLAZO CARLING & MISH LLP
747 THIRD AVENUE
NEW YORK, NY 10017-2803

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON                    OCT 29 2007

CLERK   _Marios Quintero_

(By) DEPUTY CLERK                     DATE



Francis Carling (FC 1016)
Collazo Carling & Mish LLP
747 Third Avenue
New York, NY 10017-2803
(212) 758-7600

*Attorneys for Plaintiff*

JUDGE MARRERO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 CIV 9596

RAND PUBLISHING COMPANY INC.,

                      Plaintiff,

07 Civ.    ( )

     -against-

**COMPLAINT**

VENTURETEK L.P., RICHARD ELKIN, ANTOINE
BERNHEIM, STACY BERNHEIM and GENSTAR
LTD.,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Rand Publishing Company Inc., by its attorneys, Collazo Carling & Mish LLP,

for its complaint in this action respectfully alleges:

### Nature of the Action

    1.    This is an action for indemnification under a written agreement between the

parties.

### The Parties

    2.    Plaintiff Rand Publishing Company Inc. ("Rand") is a Delaware corporation.

Although until 1994 it had offices in New York City, at the present time it does not have active

business operations; it has no principal place of business; and its accounting and oversight

functions are conducted in Connecticut.

    3.    Defendant Venturetek L.P. ("Venturetek") is a New York limited partnership. Its

general partner has his business address in New York County.

1

4.     Defendant Richard Elkin ("Elkin") is a citizen of New Jersey.

5.     Defendant Antoine Bernheim is a citizen of New York State and a resident of New York County.

6.     Defendant Stacy Bernheim is Antoine Bernheim's spouse, and is a citizen of New York State and a resident of New York County.

7.     Defendant Genstar Ltd. ("Genstar") is a Turks and Caicos corporation whose address is c/o Dome Capital Management, 405 Park Avenue, New York, New York.

### Jurisdiction and Venue

8.     There is complete diversity of citizenship between plaintiff and the defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(1).

9.     All the defendants except Elkin reside, or maintain offices, in the Southern District of New York. The events giving rise to Rand's claims occurred within the Southern District of New York. Venue is proper within this District under 28 U.S.C §§ 1391(a) and (c).

### Factual Allegations

10.     Rand was organized in February 1993 by Mason P. Slaine ("Slaine") and Michael E. Danziger ("Danziger") to publish a magazine on financial technology, and possibly to pursue other publishing or database opportunities. Later in that year, defendants were invited to invest in Rand, and agreed to do so.

11.     The terms and conditions on which defendants agreed to invest in Rand are set forth in an Agreement for Issuance and Sale of Stock (the "Shareholders' Agreement") entered into as of December 30, 1993, to which Rand, the defendants, Slaine and Danziger are parties.

12.     Section 18 of the Shareholders' Agreement provides as follows:

> *Entire Agreement.* This agreement constitutes the entire contract between the parties with respect to the subject matter of the Agreement. Neither party has relied on any representations not explicitly set forth in this Agreement.

13.    Section 20(a)(ii) of the Shareholders' Agreement provides as follows:

> Each Investor [*i.e.*, all of the defendants] shall indemnify, defend
> and hold harmless the Corporation [*i.e.*, Rand] and each Shareholder
> [*i.e.*, Slaine and Danziger] and each of their successors and assigns,
> from and against any and all Indemnifiable Losses relating to, resulting
> from or arising out of any breach of any of the representations, warranties
> and covenants of such Investor contained in this Agreement or any of the
> other agreements contemplated hereby.

14.    The promises of defendants set forth in Section 18 of the Shareholders'

Agreement constitute, at a minimum, representations and covenants within the meaning of

Section 20(a)(ii) of the Shareholders' Agreement.

15.    Rand was operated by Slaine and Danziger, who were its sole officers and two of

the three authorized directors of the corporation. Rand was an investment vehicle for the funds

contributed to it by Slaine and Danziger, and later by defendants. At the time when defendants

invested in Rand, both Slaine and Danziger were employed in full-time executive positions by

The Thomson Corporation ("Thomson"), and defendants understood that Rand was a spare-time

project for Slaine and Danziger.

16.    Rand's business commenced with the founding of a magazine, *Financial

Technology Review*, and continued with the establishment of a database business, Hospitality

Data Services, Inc. Neither business succeeded. The magazine was shut down in 1994, and the

database business was shut down in 1996. Thereafter, Rand sought opportunities to invest its

remaining funds in businesses managed by others.

17.    Slaine's employment agreement with Thomson, under which he served as

President and Chief Executive Officer of a subsidiary known as Thomson Financial, expired by

its terms on December 31, 1996. Slaine decided not to renew his agreement, and instead took

employment as Chief Executive Officer of a new company, Information Ventures LLC, which he

3

founded in 1997 together with an affiliate of E.M. Warburg, Pincus & Co. ("Warburg"), one of the premier financial institutions in the United States.

18.    In 1997 and 1998, Information Ventures acquired four businesses: two scientific, technical and medical publishers known as CRC Press, Inc. and St. Lucie Press; an information-systems publishing imprint known as Auerbach; and a patent database company called MicroPatent. These businesses were operated successfully by Information Ventures and, in 1998, Slaine and Warburg decided that Information Ventures should go public, under the name Information Holdings Inc. ("IHI").

19.    Slaine's leaving Thomson and forming Information Ventures were publicized in the business press, as were the acquisitions subsequently made by Information Ventures, and defendants were aware of these events. Prior to the announcement of the initial public offering (the "IPO") of IHI shares, defendants never objected to any of these activities or Slaine's role therein.

20.    In connection with the formation of IHI as a public company, Warburg invited Danziger to serve as a director of IHI if the IPO succeeded. Danziger decided to invest some of his own funds in the IPO, and suggested to Slaine that Rand's remaining funds likewise be invested in the IPO. Slaine agreed that this would be a good investment for those funds, but did not wish to make that decision on his own, or jointly with Danziger, because of the possibility that he would be seen as having a conflict of interest between his duties to IHI and Rand. Slaine and Danziger thus delegated to defendants the responsibility of deciding whether Rand should invest in IHI.

21.    Slaine and Danziger agreed that Danziger would approach defendants to request their consent to the investment of Rand's remaining funds in the IPO. In that connection,

4

Danziger obtained permission, from the investment bank handling the IPO, for Rand to invest on favorable terms.

22.    Early in July 1998, Danziger called the defendants by telephone and solicited their consent for Rand to invest in IHI's IPO.

23.    Although they appreciated that the opportunity presented by Danziger was an excellent investment prospect for Rand, defendants treated it instead as an opportunity for them to exact "greenmail" in connection with the proposed IPO. Defendants thereupon jointly formed a scheme to extract money from Slaine, Information Ventures and/or Warburg by threatening to interfere with the IPO. Their scheme included the following elements:

(a)    defendants would refuse to permit Rand to invest in the IPO;

(b)    defendants would retain a well-known plaintiffs' law firm to assert a false claim that the four acquisitions previously made by Information Ventures were corporate opportunities that belonged to Rand;

(c)    defendants would threaten to "go public" with their false claims, and thus disrupt the IPO, unless their claims were settled;

(d)    if the threat to disrupt the IPO were not successful, defendants would bring their false claims in court, and try to obtain a settlement by protracting the litigation and running up Rand's costs; and

(e)    because, under applicable Delaware law, it was manifest that there was no colorable basis for their claim of usurpation of corporate opportunities, defendants would also contend that Slaine's activities on Information Ventures' behalf violated oral and written representations allegedly made by Slaine prior to defendants' investment in Rand.

24.    Defendants recognized that the proposed investment of Rand's remaining funds in the IHI IPO would be a beneficial investment for Rand, and, indeed, could make the difference between Rand's success or failure. They blocked the investment in bad faith, solely to facilitate their threat of litigation and the scheme described in the preceding paragraph.

25.    On July 14, 1998, and in furtherance of the scheme described in paragraph 23 above, defendants had the firm of Milberg Weiss Bershad Hynes & Lerach LLP send a letter and draft complaint to Warburg on behalf of all the defendants except Genstar, threatening to sue Rand and Slaine on account of Slaine's work for Information Ventures. The letter stated, in part:

> My client [sic] has suggested that I make a copy of the proposed
> complaint available to you in an effort to resolve this matter before
> it becomes necessary to deal with the claims in a public fashion,
> which would include of course the probable necessity of dealing
> with issues in the proposed Information Ventures offering.

26.    Slaine and Warburg decided not to succumb to defendants' attempt at "greenmail." At a meeting with the Milberg Weiss lawyers on August 3, 1998, Slaine explained why his conduct had been proper in all respects. Milberg Weiss thereafter ceased its involvement with the matter. Appropriate disclosures were added to the IHI prospectus, and the IPO was concluded successfully in August 1998.

27.    The four acquisitions made by Information Ventures had involved an aggregate cash purchase price of $31 million, plus the assumption of $18 million in liabilities. At the time, Rand's total assets were $1.2 million in cash and an illiquid investment of $1.25 million in a company called Progressive Grocer. Under a then recent and applicable decision of the Delaware Supreme Court, *Broz v. Cellular Info. Systems*, 673 A.2d 148 (Del. 1996), defendants did not have a claim for usurpation of a corporate opportunity in these circumstances.

28.    Nevertheless, on October 19, 1998, defendants filed an action in New York Supreme Court against Rand, Slaine, Danziger and Warburg (the "State Court Action"), Index No. 605046/98 (New York County).

29.    In order to avoid the legal bar to their claims described in paragraph 27 above, defendants alleged that Slaine had induced them to invest in Rand by making representations that were later violated by his activities on behalf of Information Ventures (the "Representations Claim"). These allegations were made in bad faith, and asserting them violated defendants' representation and covenant in Section 18 of the Shareholders' Agreement that they had not "relied on any representations not explicitly set forth in this Agreement." Additionally, defendants' bringing the State Court Action violated an implied term of Section 18 of the Shareholders' Agreement that no party would sue any other party to that Agreement on the basis of claimed representations not contained in the Agreement.

30.    Defendants' assertion of the Representations Claim raised issues of fact that made it difficult to have the State Court Action dismissed as a matter of law, and required discovery that protracted the case substantially.

31.    Unbeknownst to Rand, Slaine or Danziger, the principal plaintiff in the State Court Action, Venturetek, had written off its entire investment in Rand on its 1996 tax returns. It declared on its federal and state tax returns for that year that its $2.95 million investment in Rand was completely worthless, and it took a deduction in that amount for its "loss." This was a deliberate fraud by Venturetek on the taxing authorities, including the U.S. government: Rand at the end of 1996 had no debt, over $1 million in cash, and another $1.25 million invested in Progressive Grocer (which turned out to be a very successful investment), and there was no good-faith basis for Venturetek's claim that its investment in Rand had resulted in a total loss.

7

Moreover, this tax fraud demonstrated Venturetek's bad faith in bringing the State Court Action, since its write-off of its investment in Rand as of the end of 1996 belied its claims in the State Court Action that it wished Rand to make acquisitions for its benefit in 1997 and 1998, and that Information Ventures' acquisitions equitably belonged to Rand.

32.    In 2005, after discovery in the State Court Action was finally concluded, all parties sought summary judgment.

33.    By decision and order entered on March 10, 1996, the Supreme Court, New York County (Cahn, J.) granted summary judgment to Slaine and Danziger on all defendants' claims. A copy of the decision is attached as Exhibit A.

34    The decision of Supreme Court in Slaine and Danziger's favor was unanimously affirmed on appeal by the Appellate Division, First Department, on April 12, 2007. A copy of the decision is attached as Exhibit B. Defendants' motion to reargue, or for leave to appeal to the Court of Appeals, was denied by the Appellate Division by order dated September 25, 2007. A copy of the decision is attached as Exhibit C.

35.    Defendants' implementation of their scheme, including the assertion of the Representations Claim, continued at least through September 2007, when the Appellate Division denied their motion for reargument or leave to appeal. Defendants' refusal to consent to investing Rand's funds in IHI continued until November 29, 2004, when IHI was sold and ceased to exist as a public company.

36.    Rand suffered grievous economic injury as a result of defendants' continuing implementation of the scheme described in paragraph 23 above. Its damages fall into three categories:

(a)     Defendants' bad-faith refusal to permit Rand to invest in the IHI IPO cost Rand between $6.5 and $12.5 million in profits it would have earned if it had made the investment.

(b)     Rand incurred counsel fees and expenses of approximately $900,000 in its defense of the State Court Action.

(c)     Under its by-laws and applicable Delaware law, Rand was required to indemnify Slaine and Danziger for their counsel fees and expenses in the State Court Action, which amounted to a further $1.1 million.

37.     By letter dated September 26, 2007, Rand demanded indemnification from the defendants. Defendants have not responded to this demand.

## CLAIM FOR RELIEF:
## CONTRACTUAL INDEMNIFICATION

38.     Rand repeats the allegations in paragraphs 10-37 above as though fully pleaded herein.

39.     Rand's damages in this case, as described in paragraph 36 above, were proximately caused by defendants' implementation of the scheme described in paragraph 23 above.

40.     Defendants' refusal to permit Rand to invest in the IHI IPO was an integral part of their scheme.

41.     Defendants' assertion of the Representations Claim in breach of Section 18 of the Shareholders' Agreement was also an integral part of their scheme.

42.     Rand's damages constitute "Indemnifiable Losses" within the meaning of Sections 20(a)(i) and 20(a)(ii) of the Shareholders' Agreement.

9

43.     The Shareholders' Agreement, by its terms, is governed by New York law.

44.     Under New York law, the Shareholders' Agreement contains an implied covenant of good faith and fair dealing.

45.     Defendants' implementation of their scheme, including without limitation their assertion of the Representations Claim and their refusal to invest Rand's funds in IHI, constituted a breach of Section 18 of the Shareholders' Agreement.  Defendants' breach of Section 18 of the Shareholders' Agreement was a breach of defendants' representations and covenants within the meaning of Section 20(a)(ii) of the Shareholders' Agreement, including at a minimum (i) the representation and covenant that defendants had not relied on any representations outside the Shareholders' Agreement, and (ii) the covenant of good faith and fair dealing implied by law.

46.     Rand is entitled to full indemnification from the defendants for its indemnifiable losses, including without limitation those incurred as a result of defendants' implementation of the scheme described in paragraph 23 above.

47.     On September 26, 2007, Rand sent the defendants a demand for indemnification (the "Demand Letter") based on the claims set forth herein.  A fair and accurate copy of the Demand Letter is annexed hereto as Exhibit D.  Defendants have refused to accede to Rand's demand for indemnification, and have failed and refused to perform their obligation to indemnify Rand for the losses described in the Demand Letter and in this complaint.

WHEREFORE, Rand respectfully requests that the Court enter judgment against the defendants, jointly and severally, for damages in the amount found at trial, but at a minimum for those sums set forth in paragraph 36 above, and for such other and further relief as may be just, including the costs of this action.

Dated: New York, New York
      October 29, 2007

COLLAZO CARLING & MISH LLP

By: _____
     Francis Carling (FC 1016)
747 Third Avenue
New York, NY 10017-2803
(212) 758-7600

Of Counsel:

Frederick A. Brodie (FB 6429)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036-4039
(212) 858-1000

Attorneys for Plaintiff

**EXHIBIT A**

SCANNED ON 3/10/2006

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _Cahn_____                    PART _49m_

                              _Justice_

_Ventureten, L.P., et al_                    INDEX NO. _605046/98_

                                             MOTION DATE _3/17/05_

            - v -                            MOTION SEQ. NO. _024_

_Bravel Publishing Co.,_                     MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | |
| Answering Affidavits — Exhibits | |
| Replying Affidavits | |

Cross-Motion:   ☐ Yes   ☐ No

Upon the foregoing papers, it is ordered that this motion

FILED

MAR 10 2006

COUNTY CLERK'S OFFICE
NEW YORK

MOTION IS DECIDED IN ACCORDANCE
WITH ACCOMPANYING MEMORANDUM
DECISION IN MOTION SEQUENCE . . . . . .

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE _____

Dated: ____3/8/06_____                    _____
                                                                J.S.C.

Check one:   ☐ FINAL DISPOSITION      ☑ NON-FINAL DISPOSITION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:        IAS PART 49
-----------------------------------------------X
VENTURETEK, L.P., RICHARD ELKIN, ANTOINE     :
BERNHEIM, STACY BERNHEIM, and GENSTAR,
LTD., individually and as shareholders       :    Index No.
of Rand Publishing Co., Inc.,                     605046/98
                                             :
                              Plaintiffs,
                                             :
          -against-
                                             :
RAND PUBLISHING CO., INC., MASON P.
SLAINE, MICHAEL E. DANZIGER,                 :
WARBURG PINCUS VENTURES, L.P. and
E.M. WARBURG, PINCUS & CO., L.L.C.,          :

                              Defendants.    :
-----------------------------------------------X
**Herman Cahn, J.**

        Motion sequence numbers 21, 23, 24, and 25 are

consolidated for disposition.

        Defendants Mason P. Slaine and Michael E. Danziger

separately move for summary judgment dismissing the claims

asserted against them in the second amended complaint (seq. nos.

25 and 24, respectively).

        Plaintiffs move for partial summary judgment as to

parts of their causes of action, set forth in 25 numbered

statements contained in their notice of motion (seq. No. 23),

CPLR 3212 (e).

        Defendant Slaine additionally moves for an order

excluding any testimony from non-party J. Morton Davis (seq. no.

21).

**BACKGROUND**

The facts of this case have been detailed in several prior decisions and orders of this court, familiarity with which is presumed.

Rand Publishing Co., Inc. is a small Delaware corporation that was formed, and was wholly owned, by defendants Slaine and Danziger, in February, 1993. At the time, Slaine and Danziger each invested $450,000.00 in Rand in order to launch a new start-up magazine, <u>Financial Technology Review</u> ("FTR"), which focused on the uses of computers and information technology in the financial services industry.

Following FTR's launch, Slaine and Danziger sought to raise additional monies for FTR's future capital needs, as well as to enable them to expand Rand's business by developing another start-up company, a database for the hospitality industry. To these ends, in November 1993, Slaine prepared a "Business Summary," which Rand distributed to certain potential investors (Jaroslawicz Affirm. Ex. A). The Business Summary described Rand as:

> a newly organized business engaged in information publishing. It recently launched its first product, *Financial Technology Review* (FTR), a monthly controlled circulation magazine that covers the uses of computers and information technology in the financial services industry. Rand Publishing Company also intends to develop directories, buyers guides, conferences and expositions in the financial technology field. Additionally, the company is pursuing development of a relational database covering the hospitality industry.

2

> To the extent they are available, Rand Publishing
> Company will also pursue niche acquisitions

(<u>Id.</u>)

The Business Summary indicated that Rand was hoping to raise $5,000,000.00 through the sale of 50% of its shares. The Business Summary indicated that Rand had invested $800,000.00 in FTR up to that date; that it expected to invest a total of $1.5-2.0 million in FTR, and expected to invest a total of $2.0-2.5 million in developing the hospitality database.

Plaintiffs are investors in Rand. Pursuant to an Agreement for Issuance and Sale of Stock dated December 30, 1993, plaintiffs, together, invested a total of $3.6 million in Rand, acquiring 50% of the company (Jaroslawicz Affirm. Ex. H).[1] Slaine and Danziger each retained a 25% share of Rand. Although the Agreement identified FTR as the sole "current business" of Rand (<u>id.</u> ¶ 5), plaintiffs allege that the primary purpose of Rand was to invest in or acquire additional niche publications.

The Agreement provided for a three person board (¶ 4 [k]). Slaine and Danziger served as corporate officers and directors, with plaintiff Venturetek, the largest single shareholder, having the right to name the third member. The Agreement additionally provided that, for so long as plaintiffs

---

[1]    Specifically, plaintiff Venturetek, L.P. invested $2,950,000.00, plaintiff Genstar Ltd. invested $500,000.00, plaintiffs Antoine and Stacy Bernheim together invested $100,000.00, and plaintiff Richard Elkin invested $50,000.00.

3

collectively owned 20% or more of Rand, "Danziger and Slaine shall remain actively involved in the affairs of the Corporation, to the extent that they deem appropriate to develop the business" (¶ 4 [j]).

Neither Slaine nor Danziger were to receive any compensation for their efforts on behalf of Rand. Indeed, when the Agreement was executed, both Slaine and Danziger were employed full time in executive positions at Thomson Financial Services, Inc., a large provider of financial information and software products. Between 1994 and 1996, Slaine served as President and Chief Executive Officer of Thomson Financial, where he was actively engaged in seeking niche business acquisitions in the information and publishing field, the same business in which Rand allegedly was engaged. Their employment at Thomson Financial was known to all Rand investors.

In April 1994, after receiving the infusion of new capital, Rand launched Hospitality Data Services, Inc. ("HDS"), a start-up business offering a database for the hospitality industry. In early 1995, Rand invested $1,250,000.00 of its remaining cash to acquire, along with a group of other investors, Progressive Grocer Associates ("PGA"), the publisher of two magazines focusing on the supermarket industry.

Ultimately, neither FTR nor HDS, Rand's two start-up companies, proved successful. Rand terminated its investment in

4

FTR in July 1994, and its investment in HDS in April 1996. By
the end of 1996, Rand had only $1.2-1.3 million in cash remaining
on hand, plus its investment in PGA, which was illiquid.

In quarterly letters sent to plaintiff shareholders
between July 1996 and the end of 1997, Slaine represented that he
and Danziger continued to be actively engaged in seeking out
opportunities to invest Rand's remaining funds. To that end,
plaintiffs were informed, at various times, that Slaine and
Danziger had looked at a large Florida based publishing company;
had reviewed three investments in the newsletter, book, and
electronic information areas; had made an offer on an electronic
publisher of tax and accounting information on CD Rom; and had
pursued an educational publisher called Technology in Higher
Education (Jaroslawicz Affirm. Ex. B). Some of the letters also
indicated that it was difficult to find appropriate investments,
given Rand's limited cash position and the competition for
investments in the information publishing industry.

Meanwhile, in December 1996, Slaine left his position
at Thomson Financial upon the expiration of his employment
contract. That same month, he formed a new information
publishing business, Information Ventures, L.L.C., with Warburg
Pincus Ventures, L.P. and E.M. Warburg, Pincus & Co. ("Warburg").
During 1997, the same period in which Slaine was writing letters
to Rand shareholders about how difficult it was to find

5

investment opportunities for Rand, Slaine acquired four niche publication businesses for Information Ventures: (1) CRC Press, a publisher of scientific, technical and medical, and professional titles, which was acquired for $13 million cash; (2) St. Lucie Press, a publisher of professional titles, which was acquired for $2.6 million cash; (3) Auerbach, a provider of technology-oriented print and electronic subscription based products, which was acquired for $8 million cash; and (4) MicroPatent, a provider of intellectual property information products and services, which was acquired for $7.4 million cash.

On April 17, 1998, Slaine made a final investment on behalf of Rand, by investing $500,000.00 of Rand's remaining funds in Fame Information Services, Inc., a Warburg-controlled company that provided financial software to investment and banking firms. At the time, Slaine was serving on Fame's board of directors, a fact that was disclosed to Rand shareholders prior to the purchase.

Unlike Rand, Information Ventures proved quite successful. It was decided to take it public, in 1998, as Information Holdings, Inc. ("IHI"). A prospectus and registration statement were filed with the SEC in June 1998. In anticipation of the initial public offering, Danziger was invited to, and eventually did, join IHI's Board. At about this time, Danziger allegedly suggested to Slaine that Rand be offered the

6

opportunity to invest its remaining funds in shares of IHI as part of the IPO. After Slaine obtained approval from IHI's underwriter, Danziger contacted the Rand investors and offered them the opportunity to invest Rand's available funds in IHI under favorable terms. Plaintiffs declined the offer and, shortly thereafter, threatened to sue Slaine for breach of fiduciary duty. Danziger, who was offered the same opportunity and terms as Rand, did purchase shares during the IPO.

The IPO went forward in August 1998, and IHI proved highly successful.

In October 1998, plaintiffs commenced the instant action against defendants Slaine and Danziger, alleging usurpation of corporate opportunities and breach of fiduciary duty. The complaint also sought the imposition of a constructive trust over any benefits or proceeds obtained by defendants as a result of their alleged wrongdoing.[2]

In their second amended complaint, plaintiffs allege that Slaine breached his fiduciary duty to Rand by forming Information Ventures, a company engaged in acquiring information publishing businesses in niche markets, the same line of business that Slaine and Danziger had been pursuing on behalf of Rand. Plaintiffs contend that Slaine further breached his fiduciary

---

[2] The complaint also asserted a claim against Warburg for tortious interference with contract. That claim has since been settled.

7

duty to Rand by secretly acquiring the four niche publication businesses for Information Ventures, opportunities which, they allege, should have been offered to Rand. Although Danziger was not involved in the formation of Information Ventures, or its acquisition of the four niche publications, plaintiffs allege that he breached his fiduciary duty to Rand by failing to investigate and stop Slaine from breaching his fiduciary duty and usurping those corporate opportunities rightfully belonging to Rand.

Additionally, during discovery, plaintiffs learned that, in December 1996, Slaine had entered into an employment agreement with Warburg for his work with Information Ventures. That agreement contained an exclusivity provision pursuant to which Slaine had agreed not to "engage in any other business activity" (Jaroslawicz Affirm. Ex. I § 4). Plaintiffs argue that by entering into such an agreement, Slaine further breached his fiduciary obligation to Rand to "remain actively involved in the affairs of the Corporation, to the extent that [he] deem[ed] appropriate to develop the business" (id., Ex. H ¶ 4 [j]).

Slaine argues that summary judgment dismissing all of the claims against him is warranted, as the evidence shows that Rand was never an operating company or Slaine's employer, but was merely an investment vehicle with limited funds. He contends that since Information Ventures was never in competition with

8

Rand, there was no conflict of interest in his overlapping involvement with each. Slaine further contends that the four acquisitions at issue were never Rand's corporate opportunities, because it was in no financial position to exploit them. Further, it is argued that the opportunities were not in Rand's line of business, and it had no interest or expectancy in them.

Danziger argues that summary judgment dismissing the claims against him is warranted, because he was not involved in the formation of Information Ventures, and did not know about the four acquisitions until after each had been made.

Plaintiffs argue that summary judgment on those parts of their causes of action, set forth in 25 numbered statements containing various statements of fact or law, should be granted, as doing so would serve to shorten the trial.

Finally, Slaine seeks to exclude testimony that might be offered by non-party J. Morton Davis, regarding: (a) any alleged representations made by Slaine to induce Davis to invest in Rand; and (b) Davis' claim that he would have been willing to invest more money in Rand for the acquisition of investment opportunities. Slaine argues that any testimony as to representations made to Davis by Slaine would be irrelevant, as Davis did not invest in, or become a shareholder of, Rand. Slaine additionally argues that Davis' testimony regarding his willingness to invest funds in Rand is unverifiable and self-

serving, and thus inadmissable.

**DISCUSSION**

A motion for summary judgment will be granted where a movant has made "a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). Once the movant has made such a showing, the party opposing the motion has the burden of producing evidentiary facts sufficient to raise triable issues of fact (see Zuckerman v City of New York, 49 NY2d 557 [1980]).

As an initial matter, the court notes that Delaware law applies to plaintiffs' usurpation of corporate opportunity and fiduciary duty claims, as issues of corporate governance are determined by the law of the state of incorporation (Kikis v McRoberts Corp., 225 AD2d 455 [1st Dept 1996]; Hart v General Motors Corp., 129 AD2d 179 [1st Dept], lv denied 70 NY2d 608 [1987]). Rand was incorporated in Delaware.

The corporate opportunity doctrine, as delineated in Delaware law, holds that:

> a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

10

(<u>Broz v Cellular Info. Sys., Inc.</u>, 673 A2d 148, 155 [Del 1996].)

A corollary to the doctrine states that:

> a director or officer *may* take a corporate opportunity
> if: (1) the opportunity is presented to the director or
> officer in his individual and not his corporate
> capacity; (2) the opportunity is not essential to the
> corporation; (3) the corporation holds no interest or
> expectancy in the opportunity; and (4) the director or
> officer has not wrongfully employed the resources of
> the corporation in pursuing or exploiting the
> opportunity.

(<u>Id.</u> [emphasis in original], referencing <u>Guth v Loft, Inc.</u>, 5 A2d
503, 509 [Del 1939].)

> These tests:

> provide guidelines to be considered by a reviewing
> court in balancing the equities of an individual case.
> No one factor is dispositive and all factors must be
> taken into account insofar as they are applicable

(<u>Broz</u>, <u>supra</u>, 673 A2d at 155.)

Slaine argues that summary judgment in defendants'
favor is warranted, because the evidence establishes that no part
of the four-part test for finding a usurped corporate opportunity
has been met.  Specifically, Slaine argues that Rand, with only
$1.3 million in remaining cash and $1.25 million in an illiquid
investment in PGA, clearly lacked the funds to make any of the
acquisitions at issue.  He further argues that all four of the
acquisitions at issue were in a different line of business from
that of Rand, as they all were focused in the scientific,
technical and medical segments of the publishing market, and that
there is no evidence that Rand had either an interest or

11

expectancy in any of these acquisitions. Slaine contends that there was no conflict between his duties to Rand and his work at Information Ventures, as Rand had no exclusive right to his services, and Information Ventures was not in competition with Rand. Slaine additionally argues that his employment agreement with Warburg did not prevent him from fulfilling any of his obligations to Rand, because the exclusivity provision in that agreement explicitly carved out an exception for "personal investing activities" (Jaroslawicz Affirm. Ex. I § 4).

Slaine has produced evidence to show that the four acquisitions entailed financial needs or risks that exceeded Rand's resources and capacity. Simply comparing the price of each of the four investments with the amount of cash Rand had, shows that they were beyond Rand's ability to purchase. Further, nothing in the Agreement requires, or even permits, further investment by existing shareholders, or provides a mechanism for the issuance of additional shares of Rand. Therefore, Slaine would have had no obligation to renegotiate the terms of the Agreement or restructure Rand in order to raise additional capital.

Specifically, the acquisitions of four companies - CRC Press, St. Lucie Press, Auerbach, and MicroPatent - were all equity transactions. Each required more than the capital

available to Rand at the time the opportunity arose.[3]   As for CRC

Press, the seller additionally required IHI to assume

$18,000,000.00 in liabilities (Slaine Aff. ¶ 83, Ex. 25).

Moreover, the acquisitions were undertaken at a time

when Rand had no offices, employees, or full-time management

staff available to operate the companies (Slaine Aff. [11/25/98]

¶¶ 17, 29, 36).

In response, plaintiffs submit the affidavit of Martin

A. Bell, a director of Rand.  Bell does not deny that Rand did

not have sufficient liquid assets to purchase the companies

outright, at the time the opportunity arose.  Rather, he

speculates that had plaintiffs known of the opportunity,

"Venturetek and some of Rand's other investors" would have "had,

or had access to, millions of dollars of cash to fund these

acquisitions themselves" (Bell Aff. ¶ 10).

The circumstances are not to be judged by possible

future capabilities of Rand investors.  Under Delaware law, the

right to appropriate an opportunity depends "'on the

circumstances existing at the time it presented itself ...

without regard to subsequent events'" (Broz, 673 A2d at 158,

quoting Guth, 5 A2d at 513]).  A corporation, lacking the

---

[3]      Rand had approximately $1,000,000.00 in liquid assets.
The cash purchase requirements for the referenced companies were
$15,400,000.00 for CRC Press; $4,600,000.00 for St. Lucie Press;
$9,500,000.00 for Auerbach; and $8,000,000.00 for MicroPatent
(Slaine Aff. [11/25/98] ¶ 27).

wherewithal at the time the opportunity arose, cannot claim usurpation based on speculation about the possibility of future investment (Broz, supra, 673 A2d at 158; see also, Fliegler v Lawrence, 361 A2d 218, 224 [Del 1976] [corporation could not show that it had "ready sources capital" for the opportunity at the time it arose]).

Bell's speculative statements about possible future investment are rendered even more tenuous by the following: (1) the Rand Stockholders' Agreement makes no provision for additional investment by stockholders (Bell Depo. at 463; Wertheim Depo. at 289; Elkin Depo. at 285, 456-57, 461; Selengut Depo. at 43, 185-86, 202-04); (2) David Selengut, a member of Venturetek's general partner, never told anyone at Rand that he would invest additional money in the company (Selengut Depo. At 460-61); (3) plaintiff Richard Elkin, a Rand stockholder, testified that he never offered to invest additional money in the company, nor was he prepared to do so (Elkin Depo. at 645); and (4) plaintiff Antoine Bernheim, a Rand stockholder, testified that neither he, his wife, co-plaintiff/stockholder Stacy Bernheim, or his company, plaintiff Genstar Ltd., were prepared to invest additional money in the company (Antoine Bernheim Depo. at 448).

Plaintiffs fail to establish the key prerequisite of having a "reasonable expectancy" in the opportunity (Guth, supra,

14

5 A2d at 511). Paragraph 4 (j) of the Rand Stockholders'
Agreement provided that Danziger and Slaine "shall remain
actively involved in the affairs" of Rand only "to the extent
that they deem appropriate to develop the business" (see, Bell
Depo. at 246). Moreover, each one of the four companies was
directed to Slaine through his involvement with Information
Ventures and Warburg Pincus; they were not directed to him as a
director of Rand (Slaine Aff. ¶¶ 81-93). Thus, Rand cannot make
out a claim against Slaine in these circumstances, because a
director is not liable when he is presented the opportunity in a
capacity other than as a director or officer of the plaintiff
corporation (Broz, supra, 673 A2d at 155; Guth, supra, 5 A2d at
509).[4]

Consequently, plaintiffs cannot show actionable conduct
on defendants' part, in support of their claims of usurpation of
corporate opportunities. Therefore, defendants motions for
summary judgment dismissing the complaint is granted.

In view of the foregoing, plaintiffs' motion for

---

[4] The analysis concerning Rand's inability to take
advantage of the opportunity altogether, applies equally to the
benefit of all defendants. Additionally, as for defendant
Danziger in particular, there is no evidence that he played any
role in the formation of Information Ventures, or that he
possessed prior knowledge of the four acquisitions.

partial summary judgment is denied.[5]

Defendant Slaine's motion to preclude the trial testimony of J. Morton Davis is denied, as moot.

Accordingly, it is

ORDERED that defendant Mason P. Slaine's motion for summary judgment to dismiss the claims asserted against him in the second amended verified complaint (seq. no. 25) is granted; and it is further

ORDERED that defendant Michael E. Danziger's motion for summary judgment to dismiss the claims asserted against him in the second amended verified complaint (seq. no. 24) is granted; and it is further

ORDERED that the plaintiffs' motion for partial summary judgment (seq. no. 23) is denied; and it is further

ORDERED that defendant Mason P. Slaine's motion for an order to exclude any testimony from non-party J. Morton Davis in this action (seq. no. 21) is denied, as moot; and it is further

---

[5]     Plaintiffs failed to submit a statement "of the material facts as to which the moving party contends there is no genuine issue to be tried," as required by Rule 19-a of the Rules governing the Commercial Division.  Their failure to have submitted such a statement constitutes another ground for denial of this motion, as indicated by the language of that Rule.

       ORDERED that the clerk shall enter judgment in accordance herewith.

Dated:    March 8, 2006

                         E N T E R :

                         _____/s/_____
                             J.S.C.

**EXHIBIT B**

Saxe, J.P., Sullivan, Nardelli, Gonzalez, Kavanagh, JJ.

773      Venturetek, L.P., et al.,              Index 605046/98
              Plaintiffs-Appellants,

                    -against-

         Rand Publishing Co., Inc., et al.,
              Defendants,

         Mason P. Slaine, et al.,
              Defendants-Respondents.

_____

Jaroslawicz & Jaros, New York (David Jaroslawicz of counsel), for
appellants.

Collazo Carling & Mish LLP, New York (Francis Carling of
counsel), for Mason P. Slaine, respondent.

Himelman, Wertheim & Geller, LLC, Old Bridge, NJ (Lawrence H.
Wertheim of counsel), for Michael E. Danziger, respondent.

_____

     Order, Supreme Court, New York County (Herman Cahn, J.),

entered March 10, 2006, which granted the motions by defendants

Slaine and Danziger for summary judgment dismissing the complaint

against them, and denied plaintiffs' motion for partial summary

judgment, unanimously affirmed, with costs.

     Plaintiffs, shareholders of defendant Rand Publishing Co.,

allege, inter alia, breach of fiduciary duty and usurpation of

corporate opportunities by Slaine and Danziger, also Rand

shareholders, in connection with said defendants' acquisition of

four companies on behalf of another entity of which those

defendants were full-time employees.

     It is well settled that the law of the state in which an

entity was incorporated (here, Delaware) is controlling as to

matters relating to its internal affairs (*Carroll v Weill*, 2 AD3d 152, 153 [2003], *lv denied* 2 NY3d 704 [2004]). Under Delaware law, a fiduciary may "take a business opportunity for himself once his corporation has properly rejected the opportunity or if it is established that it is not in a position to take it" (*Field v Allyn*, 457 A2d 1089, 1099 [Del Ch 1983], *affd* 467 A2d 1274 [Del 1983]).

Therefore, while "a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation," the corollary to this rule is that "a director or officer may take a corporate opportunity if: (1) the opportunity is presented to the director or officer in his individual and not his corporate capacity; (2) the opportunity is not essential to the corporation; (3) the corporation holds no interest or expectancy in the opportunity; and (4) the director or officer has not wrongfully employed the resources of the corporation in pursuing or exploiting the opportunity" (*Broz v Cellular Info. Sys.*, 673 A2d 148, 155 [Del 1996]).

Clearly, Rand lacked the funds to make any of the four acquisitions in question, much less all of them (*see id.*; *Wolfensohn v Madison Fund*, 253 A2d 72, 76 [Del 1969]). At the

time the acquisitions were made, Rand's assets consisted of approximately $1.2 million in cash and an illiquid investment of $1.25 million, whereas the cash purchase prices for the four subject entities totaled $31 million, and the buyer of one of the entities was also required to assume $18 million in liabilities. Although plaintiffs speculate that they were not afforded the opportunity to raise the requisite funds or that they might have been able to finance the purchases by some means other than having to put up the necessary cash, the fact remains that the Rand shareholders agreement made no provision for additional capital contributions from any of the stockholders, and none of the plaintiffs ever offered to invest any more money in Rand.

It is thus clear that at the crucial point at which the employer of Slaine and Danziger acquired the properties (*see Broz*, 673 A2d at 156), Rand did not possess the financial capacity to purchase any of the four properties, and plaintiffs' conjecture to the contrary is insufficient to raise a triable issue of fact in the absence of any concrete evidence that Rand had the requisite financial resources to avail itself of the opportunity to buy those entities. There is, similarly, no evidence that Rand had any interest or expectancy in the subject properties (*id.*). Indeed, it is undisputed that Rand had no exclusive right to the services of either individual defendant, and "a corporate officer or director is entirely free to engage in an independent, competitive business, so long as he violates no legal or moral duty with respect to the fiduciary relation

57

that exists between the corporation and himself" (*Guth v Loft, Inc.*, 5 A2d 503, 514 (Del 1939).

We have considered plaintiffs' remaining arguments and find them unavailing.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  APRIL 12, 2007

*Catherine O'Hagan Wolfe*
CLERK

58

**EXHIBIT C**

At a Term of the Appellate Division of the Supreme
Court held in and for the First Judicial Department in
the County of New York on September 25, 2007.

Present - Hon. David B. Saxe,                Justice Presiding,
               Joseph P. Sullivan
               Eugene Nardelli
               Luis A. Gonzalez
               E. Michael Kavanagh,          Justices.

-------------------------------------X
Venturetek, L.P., et al.,
          Plaintiffs-Appellants,
                                                      M-2510
          -against-                            Index No. 605046/98

Rand Publishing Co., Inc., et al.,
          Defendants,

Mason P. Slaine, et al.,
          Defendants-Respondents.
-------------------------------------X

          Plaintiffs-appellants having moved for reargument of or,
in the alternative, for leave to appeal to the Court of Appeals
from the decision and order of this Court entered on April 12,
2007 (Appeal No. 773),

          Now, upon reading and filing the papers with respect to
the motion, and due deliberation having been had thereon,

          It is ordered that the motion is denied.

                         E N T E R:

                         _____
                              DEPUTY Clerk

**EXHIBIT D**

**RAND PUBLISHING COMPANY INC.**
70 Baldwin Farms South
Greenwich, CT 06831

September 26, 2007

Venturetek L.P.
c/o David Selengut, c/o Marvin Heiman
25th Floor
39 Broadway
New York, NY 10006

Genstar Ltd.
c/o Dome Capital Management Inc.
405 Park Avenue
New York, NY 10022

Richard Elkin
c/o D.H. Blair & Co.
44 Wall Street
New York, NY 10005

Antoine and Stacy Bernheim
50 East 79th Street
New York, NY 10021

        Re:    Demand for Indemnification

Dear Investors:

I write on behalf of Rand Publishing Company Inc. ("Rand").

This letter shall constitute a demand for indemnification against each of you under section 20(a)(ii) of the Agreement for Issuance and Sale of Stock dated as of December 30, 1993 (the "Shareholders' Agreement"). Rand is entitled to indemnification from each of you for damages, attorneys' fees and expenses incurred in the course of litigating the action captioned *Venturetek L.P. et al. v. Rand Publishing Co., Inc. et al.*, Index No. 605046/98 (Supreme Court, N.Y. County) (the "Litigation").

Section 20(a)(ii) of the Shareholders' Agreement permits Rand to obtain indemnification from you "from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any breach of any of the representations, warranties or covenants of such Investor contained in this Agreement." Section 20(a)(i) defines "Indemnifiable Losses" as "any and all claims, penalties, fines, sanctions, demands, suits, losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim or any Direct Claim . . . including, without limitation, the reasonable costs

and expenses of any and all actions, suits, proceedings, demands, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees in connection therewith." Section 20(b)(iii) of the Shareholders' Agreement defines a "Direct Claim" as "any Indemnifiable Loss which does not result from a Third Party Claim." The losses suffered by Rand give rise to a Direct Claim.

The grounds for the Direct Claim are as follows. In Section 18 of the Shareholders' Agreement, each of you promised that "[t]his Agreement constitutes the entire contract between the parties with respect to the subject matter of this Agreement." Further, each of you promised that you had not "relied on any representations not explicitly set forth in this Agreement." In the Litigation, however, you sought recovery based on a business plan and other alleged representations that were made prior to the Shareholders' Agreement. Such theories and allegations were contrary to the representation, warranty and covenant contained in Section 18 of the Shareholders' Agreement. Through April of 2007, in connection with the Litigation (and your prior, equally baseless demands), Rand incurred approximately $2 million in attorneys' fees and expenses, including such fees and expenses incurred on behalf of Mason Slaine and Michael Danziger which Rand was required to indemnify. In addition, Rand suffered damages of between $6.5 million and $12.5 million on account of your refusal to permit it to invest in the initial public offering of Information Holdings Inc., which refusal was intended to facilitate the Litigation, and therefore gave rise to an Indemnifiable Loss.

On September 25, 2007, the Appellate Division, First Department, issued a final decision resolving the Litigation in favor of the Defendants. This letter shall therefore constitute notice of a Direct Claim pursuant to Section 20(b)(iii) of the Shareholders' Agreement.

Please direct any response to this demand to Rand's counsel, Francis Carling, c/o Collazo Carling & Mish LLP, 747 Third Avenue, New York, NY 10017-2803.

Very truly yours,

Michael Danziger
President

cc:  David Selengut, Esq.
     c/o Ellenoff Grossman & Schole LLP
     370 Lexington Avenue
     New York, NY 10017-6503

     Richard Elkin
     12 Grant Way
     Princeton, NJ 08540-1600

     Antoine and Stacy Bernheim
     1088 Park Avenue
     New York, NY 10128

2

# EXHIBIT "B"

## Agreement for Issuance and Sale of Stock

Agreement made and entered into as of the 30th day of December, 1993, by and between RAND PUBLISHING COMPANY INC. a Delaware corporation, authorized in New York, with offices at 780 Third Avenue, New York, New York 10017 (the "Corporation"), VENTURETEK L.P., a New York limited partnership, whose address is that of its general partner, David Selengut, c/o Marvin Heiman, 25th Floor, 39 Broadway, New York, New York, GENSTAR LTD., a Turks and Caicos corporation, whose address is c/o Dome Capital Management Inc., 405 Park Avenue, New York, New York, Richard Elkin, c/o D.H. Blair & Co., 44 Wall Street, New York, New York 10005 and ANTOINE and STACY BERNHEIM, residing at 50 East 79th Street, New York, New York (collectively the "Investors"), and MASON SLAINE residing at 24 Rockwood Lane Spur, Greenwich, Connecticut, and MICHAEL DANZIGER residing at 7 Pollack Drive, Marlboro, New Jersey (collectively the "Shareholders").

Whereas, the Corporation desires to obtain additional funds to enable it to promote, develop and expand its facilities and its business, and

Whereas, the Investors are prepared to furnish and supply funds to the Corporation by subscribing to and purchasing shares of common stock of the Corporation, and

Whereas, the Corporation is authorized to issue one thousand (1,000) shares of common stock, no par value, (the "Stock"), and no other stock is currently authorized, and

Whereas, seventy two (72) of shares of Stock have been issued to Mason Slaine and are outstanding and held by him and seventy two (72) shares of Stock have been issued to Michael Danziger and are outstanding and held by him and said shares held by Mason Slaine and Michael Danziger are the only shares of Stock that have been issued or are outstanding, and

Whereas the Investors are willing to purchase one hundred and forty four (144) shares of stock of the Corporation for Three Million Six Hundred Thousand ($3,600,000.00) Dollars and the Corporation is willing to sell the Investors one hundred and forty four (144) of its shares at that price, said purchase and sale to be governed by the terms and conditions set forth in this Agreement,

Now, THEREFORE, in consideration of the foregoing, and of the mutual covenants, agreements, undertakings, representations, and warranties set forth below, it is agreed as follows:

1.   *Sale and purchase of shares.* Subject to the terms and conditions hereof and

in reliance upon the representations and warranties, and the accomplishment and completion of the undertakings, set forth herein, the Corporation shall issue and sell to the Investors one hundred and forty four (144) shares of the Stock (the "Shares") as follows:

> 4 shares to Antoine and Stacy Bernheim
>
> 20 shares to Genstar Ltd.
>
> 118 shares to Venturetek L.P.
>
> 2 shares to Richard Elkin

The Investors shall purchase the Shares at the purchase price specified in paragraph 2 hereof. All of the Shares must be purchased.

2. *Purchase Price.* The purchase price for the Shares is Twenty Five Thousand ($25,000.00) Dollars per share, for a total purchase price of Three Million Six Hundred Thousand ($ 3,600,000.00) Dollars for all of the Shares. The purchase price shall be paid as follows:

> $100,000 by Antoine and Stacy Bernheim
>
> $500,000 by Genstar Ltd.
>
> $2,950,000 by Venturetek L.P.
>
> $50,000.00 by Richard Elkin

3. *Closing.* The closing of the sale and purchase of the Shares shall be held at the office of the Corporation, at 10:00 a.m. on January 5, 1994, (the "Closing Date"), or at any later time and date the Corporation and the Investors may agree upon. On the Closing Date, the Corporation shall deliver the Shares to the Investors against payment for the Shares by certified or bank check drawn upon or issued by and payable at a bank with regular banking offices in New York City, or by wire transfer to a bank account designated by the Corporation.

4. *Representations, Warranties and Covenants of the Corporation and the Shareholders.* The Corporation and each of the Shareholders jointly and severally represents and warrants to, and agrees and covenants with the Investors that:

(a) The Corporation was duly organized and is a validly existing corporation in good standing under the laws of the State of Delaware with full power and authority to own its properties and conduct the business in which it is now engaged. The Corporation also is duly qualified to do business and is in good standing in the State of New York.

(b) On the Closing Date the aggregate number of shares of Stock of the Corporation that the Corporation shall be authorized to issue shall include the Shares being sold and bought under this Agreement. When issued and delivered as provided in this Agreement, all of these Shares shall be validly issued, fully paid and nonassessable.

(c) This Agreement has been duly authorized, executed and delivered on behalf of the Corporation, and constitutes the valid and binding contract of the Corporation and each

of the Shareholders, enforceable in accordance with its terms. The Corporation has the full power and lawful authority to enter into this Agreement and to issue and sell the Shares on the terms and conditions set forth herein.

(d)    The consummation of the transactions contemplated hereby in compliance with the terms and provisions hereof will not conflict with, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance on any property or assets of the Corporation or either Shareholder pursuant to, any indenture, mortgage, deed of trust, agreement, corporate document, contract, or other instrument to which the Corporation or either Shareholder is a party or by which the Corporation or either Shareholder or their respective properties are bound.

(e)    There are no actions, suits or proceedings pending or, to the knowledge of the Corporation or either shareholder, threatened against the Corporation, its properties or its assets in any court or before any governmental or administrative agency that could have a material or adverse effect on the business of the Corporation as it is now conducted, on the properties of the Corporation, on the financial condition of the Corporation, or on the income of the Corporation, and the Corporation is not in default under any order, judgment or decree of any court or governmental or administrative agency.

(f)    The Corporation is not a party to any agreement or instrument, or subject to any charter, bylaw or other corporate restrictions materially or adversely affecting its business and operations, present or prospective, or its property, assets or condition, financial or otherwise.

(g)    The Corporation is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any bond, debenture, note, or other evidence of indebtedness or any contract or other agreement to which the Corporation is a party.

(h)    Prior to the Closing Date, the Corporation shall not declare or pay any dividend or make any other distribution on or with respect to its common stock.

(i)    Prior to the Closing Date, and for so long as Venturetek LP owns all the Shares transferred to Venturetek LP in accordance with this Agreement, the Corporation shall not issue any shares or equity interests of any kind without Venturetek LP's written consent.

(j)    For so long as the Investors collectively own twenty percent (20%) or more of the outstanding shares of the Corporation, the Corporation may not be dissolved or dividends declared without the unanimous consent of the Investors and Danziger and Slaine shall remain actively involved in the affairs of the Corporation, to the extent that they deem appropriate to develop the business.

(k)    On the Closing Date, one person nominated by Venturetek L.P. shall be elected as a member of the board of directors of the Corporation.  For so long as Venturetek LP

is the owner of all the Shares transferred to Venturetek LP in accordance with this Agreement, Venturetek L.P. shall nominate one person who shall be elected as a member of the board of directors of the Corporation and no more than three persons shall constitute the board of directors of the Corporation.

(l)     For so long as the Venturetek LP owns all the Shares transferred to Venturetek LP in accordance with this Agreement, the Corporation shall maintain and pay for renewable term life insurance on Michael Danziger in the face amount of at least $1,000,000 and on Mason Slaine in the face amount of at least $2,000,000, each policy having the Corporation named as primary beneficiary and each subject to no liens, encumbrances or assignments of any kind.

(m)     For so long as Venturetek LP owns all of the shares transferred to Venturetek LP in accordance with this Agreement, the salaries and other compensation of the Shareholders shall not be increased without Venturetek LP's written consent.

5.     *Current Business*. Investors are aware that the sole current business of the Corporation is the publishing of a periodical known as Financial Technology Review. The Investors are further aware that only one issue of that periodical has been published. No representations have been made regarding the profitability of that publication.

6.     *Conditions Precedent to Investors' Obligation*. The Investors shall be under no obligation to purchase the Shares as contemplated by this Agreement unless on or prior to the Closing Date the Corporation has performed all of its agreements and undertakings hereunder on or prior to that time, and the following additional conditions have been fulfilled:

(a)     On or prior to the Closing Date, the Investors shall have received the opinion of the Corporation's counsel, Turchin & Hoffman, P.C., dated as of the Closing Date, addressed to the Investors and in form and substance satisfactory to the Investors to the effect that:

(1)     The Corporation was duly organized and is a validly existing corporation in good standing under the laws of the State of Delaware with full power and authority to own its properties and conduct the business in which it is now engaged, and is duly qualified to do business as a foreign corporation and is in good standing in New York;

(2)     This Agreement has been duly authorized, executed and delivered on behalf of the Corporation and the Shareholders, and constitutes the valid and binding agreement of the Corporation and each of the Shareholders, enforceable in accordance with its terms;

(3)     The Corporation is duly authorized to issue and

sell the Shares, and the Shares when issued and sold in accordance with the terms of this Agreement shall be validly issued, and nonassessable, and the shares of the Corporation's outstanding capital stock now are, validly issued fully paid and nonassessable; and

(4)    The making of this Agreement and the issuance and delivery of the Shares purchased under and pursuant to this Agreement constitute an exempt transaction under the Securities Act of 1933, as amended; and the issuance and delivery of the Shares purchased under and pursuant to this Agreement, and the performance of this Agreement, are in conformity with the securities laws of all applicable states.

The opinion shall also encompass whatever other legal matters the Investors may reasonably request.

(b)    The representations and warranties of the Corporation and the Shareholders set forth in subparagraphs (a) to (m), inclusive, paragraph 4 hereof, shall be true at the Closing Date with the same effect as though they had been made by the Corporation and the Shareholders at that time, and the Investors shall receive a satisfactory certificate signed by the President or a vice-president of the Corporation and by each shareholder to that effect.

(c)    All proceedings taken at or prior to the Closing Date in connection with the transactions contemplated in this Agreement and all instruments, authorizations, certificates, and other documents applicable hereto shall be satisfactory in form and substance to the Investors and to their counsel, and the Investors and their counsel shall have received copies of all of such documents that they may reasonably request.

(d)    The Investors represent that they have been fully appraised of, and are totally aware of the nature of the investment being made and the financial risks of the investment. In addition, the Investors have been offered access to all of the Corporation's books, records, information, agreement and documents that they have deemed necessary and appropriate under the circumstances. The Investors do not require or desire any information or data pertaining to the Corporation.

7.    *Representations and Warranties of the Investors.*

(a)    Each Investor represents and warrants to, and agrees with the Corporation, that such Investor is purchasing the Shares for its own account, for investment, and that it has no present intention of distributing or reselling any of the Shares, including but not limited to any distribution to the partners of Venturetek L.P. or the shareholders of Genstar Ltd.

(b)    Venturetek L.P. represents and warrants that the general partner of Venturetek L.P. is David Selengut with offices at c/o Marvin Heiman, 25th Floor, 39 Broadway, New York, New York 10013. Venturetek L.P. agrees that, except pursuant to Paragraph 8 of this Agreement, without the prior written consent of the Corporation, it will not windup, liquidate its affairs, dissolve, or distribute, assign, sell, transfer, hypothecate, or pledge the Shares.

(c)    Venturetek L.P. agrees that the Corporation may deal with it through the general partner and that notices to and agreements by the general partner will be binding on Venturetek L.P.

(d)    Genstar Ltd., Antoine and Stacy Bernheim and Richard Elkin agree that they will not distribute, assign, sell, transfer, hypothecate, or pledge the Shares except pursuant to Paragraph 8 of this Agreement without the prior written consent of the Corporation.

8.    *Registration Rights.* If the Corporation or any of its shareholders shall at any time or times determine to register under the Securities Act of 1933 (the "Securities Act") any Shares or other securities of the Corporation (other than the registration of an offer and sale of securities to employees of the Corporation pursuant to an employee or similar benefit plan, registered on Form S-8 or comparable form; or a registration relating to a merger, acquisition or other transaction of the type described in Rule 145 or comparable rule, on Form S-4 or similar form), the Corporation will give written notice thereof to the Investors.

(a)    The Corporation's notice shall afford the Investors an opportunity to elect within 30 days after receipt thereof to include in such filing all or any part of the Shares of the Corporation owned by it. If the aggregate number of Shares that the Investors desire to include in such filing exceeds the number of permissible shares to be offered as determined by the representative of the underwriter, then the Investors shall be entitled to include that number of Shares that bears the same ratio to the number of permissible shares as the number of Shares the Investors desire to include bears to the sum of the number of shares the Corporation proposes to register and the number of Shares all shareholders desire to include. Such representative may increase or decrease the number of permissible shares at any time until all shares included in such registration shall have been sold by such underwriters.

(b)    The inclusion in such filing of shares of the Corporation held by the Investors shall be upon the condition that the Investors sell their respective Shares to the underwriters on the same terms and conditions as the Corporation and other selling Shareholders.

9.    *Come-Along.* The Shareholders agree that no sale or transfer of their Shares in the Corporation will be made by them, unless the Investors, and each of them, shall be afforded the opportunity to sell or transfer to the transferee, on terms and conditions at least as favorable as to the Shareholders, a percentage of the Investors' Shares. The percentage of Shares to be sold or

transferred shall be derived by dividing the number of Shares in the Corporation which the transferee agrees to acquire or purchase by the total number of shares in the Corporation which all shareholders desire to sell or transfer but in no event shall the percentage exceed 100%.

10.  *Provisions to Survive Delivery.* The representations, warranties, covenants, understandings, agreements, and other statements of the Corporation and the Investors expressly set forth in this Agreement shall survive delivery of, and payment for, the Shares.

11.  *Furnishing of Information.* The Corporation covenants that as long as an Investor holds any of the Shares, the Corporation shall furnish such Investor whatever information concerning the business, affairs and financial condition of the Corporation the Investor may reasonably request, and the Investor or its representative, upon reasonable notice, may visit and inspect any of the properties and examine any of the books and records of the Corporation, and the Corporation shall provide to such Investor quarterly unaudited balance sheets and statements of income and expenses.

12.  *Securities Legend.* The certificates representing the Shares delivered to the Investors under and pursuant to this Agreement shall bear a legend in substantially the following form:

> The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state. The securities have been acquired for investment and may not be sold, offered for sale or transferred in the absence of an effective registration under the Securities Act of 1933, as amended, and any applicable state securities laws, or an opinion of counsel satisfactory in form and substance to counsel for the Corporation that the transaction shall not result in a violation of federal or state securities laws.

> The shares represented by this certificate are subject to an Agreement among the Corporation and the shareholders of the Corporation. That agreement, which is available for inspection at the offices of the Corporation, places certain restrictions on the transfer of the shares of the Corporation.

The Shareholders represent that the foregoing legend appears on the certificates for the shares owned by the Shareholders.

13.  *Governing Law and Litigation.*  This Agreement shall be construed in accordance with the laws of the State of New York. All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of New York. Any action or proceeding arising out of or relating to this Agreement may only be brought in the State of New York and each party consents to the jurisdiction of the Courts of the State of New York, subject, however, to the proper service of process.  GENSTAR hereby designates Dome Capital Management Inc., at the above address, as its agent for service of process. Venturetek LP hereby designates Martin Hieman, at the above address, as its agent for service of process.

14.  *Assignment.* Neither this Agreement nor any interest of any party herein may be assigned, pledged or transferred without the parties' prior written consent.

15.  *Binding Effect.* This Agreement inures to the benefit of, and is binding upon, the parties hereto, and their respective heirs, representatives, successors, assigns, and controlling person, but nothing herein shall be construed as an authorization or right of any party to assign its rights and obligations hereunder.  A successor or an assign does not include a purchaser of the common stock of the Corporation solely by reason of that purchase.

16.  *Waiver.* No waiver of any provision hereof is valid unless it is in writing and signed by the person against whom it is charged.

17.  *Notice.* All notices under this Agreement must be in writing addressed to the person at the address specified herein, or at an address changed in this manner.

18.  *Entire Agreement.* This Agreement constitutes the entire contract between the parties with respect to the subject matter of the Agreement.  Neither party has relied on any representations not explicitly set forth in this Agreement.

19.  *Amendment.* This Agreement may not be amended, modified, or changed except in a writing signed by the parties.

20.  *Indemnification.*

(a) Subject to the terms and limitations set forth in Section 20 (b) below:

(i) The Corporation and each Shareholder shall jointly and severally indemnify, defend and hold harmless each Investor and their respective general and limited partners, shareholders, officers, agents and representatives, from and against any and all claims,

penalties, fines, sanctions, demands, suits, losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim or any Direct Claim (each as defined in Section 20(b) below) (including, without limitation, the reasonable costs and expenses of any and all actions, suits, proceedings, demands, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees in connection therewith) (individually and collectively "Indemnifiable Losses") relating to, resulting from or arising out of: (A) any breach of any of the representations warranties or covenants of the Corporation or the Shareholders contained in this Agreement or any of the other agreements contemplated hereby, and/or (B) the operation of the Corporation.

(ii)    Each Investor shall indemnify, defend and hold harmless the Corporation and each Shareholder and each of their successors and assigns, from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any breach of any of the representations, warranties or covenants of such Investor contained in this Agreement or any of the other agreements contemplated hereby.

(iii)    For purposes of this Agreement, "Indemnity Payment" shall mean any amounts of Indemnifiable Losses required to be paid pursuant to this Section 20 (a).

(iv)    For purposes of this Agreement, "Indemnitee" shall mean any person, entity or group entitled to indemnification under this Agreement.

(v)    For purposes of this Agreement, "Indemnifying Party" shall mean any person, entity or group required to provide indemnification under this Agreement.

(b):    (i) If an Indemnitee receives notice of the assertion of any claim or of the commencement of any action or proceeding by any person, entity or group (a "Third Party Claim") against such Indemnitee, with respect to which an Indemnifying Party is obligated to provide indemnification under Section 20(a) above, the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. Such notice shall describe the Third Party Claim in reasonable detail, and shall indicate the estimated amount, if practicable, of the Indemnifiable Loss that has or may be sustained by the Indemnitee. The Indemnifying Party shall have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel (reasonably satisfactory to the Indemnitee), and the Indemnitee shall cooperate in good faith in such defense.

(ii) If within 10 calendar days after an Indemnitee receives written notice from an Indemnifying Party that such Indemnifying Party has elected to assume the defense of any Third Party Claim as provided in the last sentence of Section 20 (b) (i) above, the Indemnifying Party shall not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the

defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within 10 calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party shall be liable for any reasonable expenses therefor. Without the prior written consent of the Indemnitee, the indemnifying Party shall not enter into any settlement of the Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to reimbursement hereunder.

(iii)    Any claim by an Indemnitee on account of any Indemnifiable Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party shall have a period of 30 calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not so respond within such 30 calendar day period, the Indemnifying Party shall be deemed to have rejected such claim in which event the Indemnitee shall be free to pursue such remedies as may the available to the Indemnitee under any applicable Laws, subject to the terms of this Agreement, including, without limitation, the enforcement of the Indemnitee's Rights under this Agreement.

(iv)    A failure to give timely notice as provided in this Section 20 (b) shall not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party which was entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or incurred an obligation or liability which otherwise would have been avoided.

(v)    Upon making any Indemnity Payment the Indemnifying Party shall, to the extent of such Indemnity Payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the Indemnity Payment related; provided, however, that (i) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss. and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said Indemnity Party is hereby made expressly subordinated and subjected in right of payment to tale Indemnitee's rights against such third party. Without limiting the generality of any other provision hereof, each such Indenmitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subrogation rights.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day, month and year first written above.

RAND PUBLISHING COMPANY INC.

By: _____
          President

_____
ANTOINE BERNHEIM

_____
STACY BERNHEIM

VENTURETEK L.P.

By: _____
          General Partner

_____
MICHAEL DANZIGER

_____
MASON SLAINE

_____
Richard Elkin

GENSTAR LTD.

By: _____

# EXHIBIT "C"

# Delaware

PAGE  1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT THE CERTIFICATE OF INCORPORATION OF "RAND PUBLISHING CO., INC.", WAS RECEIVED AND FILED IN THIS OFFICE THE NINETEENTH DAY OF FEBRUARY, A.D. 1993.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION IS NO LONGER IN EXISTENCE AND GOOD STANDING UNDER THE LAWS OF THE STATE OF DELAWARE HAVING BECOME INOPERATIVE AND VOID THE FIRST DAY OF MARCH, A.D. 1997 FOR NON-PAYMENT OF TAXES.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION WAS SO PROCLAIMED IN ACCORDANCE WITH THE PROVISIONS OF GENERAL CORPORATION LAW OF THE STATE OF DELAWARE ON THE THIRTIETH DAY OF MAY, A.D. 1997, THE SAME HAVING BEEN REPORTED TO THE GOVERNOR AS HAVING NEGLECTED OR REFUSED TO PAY THEIR ANNUAL TAXES.

2326388   8400

071294555

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 6217241

DATE: 12-06-07

# EXHIBIT "D"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

VENTURETEK, L.P., RICHARD ELKIN, ANTOINE
BERNHEIM, STACY BERNHEIM, and GENSTAR,
LTD., derivatively as shareholders of Rand Publishing
Co., Inc.,

                                        Plaintiffs,

        -against-

RAND PUBLISHING COMPANY, INC., MASON P.
SLAINE, MICHAEL E. DANZIGER, WARBURG PINCUS
VENTURES, L.P. and E.M. WARBURG, PINCUS
& CO., LLC,

                                        Defendants.

------------------------------------------------------------------x

Index No. ~~6054046/98~~ 605046/98

SECOND   VERIFIED
AMENDED COMPLAINT

        Plaintiffs, by their attorneys, Jaroslawicz & Jaros, make the following allegations

upon information and belief, except for the allegations as to the facts concerning plaintiffs

themselves, which are based upon personal knowledge.

## NATURE OF ACTION

        1.      Pursuant to the written Agreement for Issuance and Sale of Stock

("Agreement") attached hereto (Exhibit A), plaintiffs invested $3.6 million in January 1994

to jointly acquire a fifty-percent (50%) interest in Rand Publishing Company, Inc. ("Rand").

        2.      The investment was based on the representation of the defendants Mason

Slaine ("Slaine") and Michael E. Danziger ("Danziger")that Slaine and Danziger would

remain actively involved in the affairs of the corporation and that, Slaine, as chairman of

the board and Danziger as an officer of Rand, they would devote themselves to pursuing

and acquiring suitable information/publishing investments for the shareholders' $3.6 million and would concentrate on niche publications; see Exhibit A, sub-division 4(j).

3.      Slaine and Danziger represented that they would diligently pursue the acquisition of suitable publications for Rand which was the major purpose of the plaintiffs' investment into Rand. Plaintiffs also acquired the right to nominate one of three members of Rand's board of directors and did appoint Martin Bell as a director of Rand.

4.      Slaine's expertise and experience in the publishing field and his representation that he would investigate and make suitable information/ publishing investments for Rand constituted Slaine's contribution to Rand and the basis for (i) permitting him, without him making any further monetary investment, to retain (25%) percent of the stock of Rand and to hold one of three seats on Rand's board of directors, and for (ii) permitting Slaine's friend, business associate and alter-ego, co-defendant, Danziger ("Danziger"), to hold a second seat and to retain the remaining 25% of Rand stock. The Agreement also specifically provided that so long as plaintiffs held 20% of Rand's stock, "Danziger and Slaine shall remain actively involved in the affairs of the Corporation [Rand], to the extent that they deem appropriate to develop the business" (Exhibit A, 4(j).

5.      Slaine and Danziger as a unit had previously been involved in related business ventures with some of the same plaintiffs since at least 1987, including, among others, companies known as Rand Communications, Inc., Rand Data Services, Inc. and Rand Capital Corp.

6.    To plaintiffs' knowledge, Slaine and Danziger have worked together since at least 1984, with Slaine acting as Danziger's mentor and Slaine and Danziger would act as the active officers of Rand Communications Inc., Rand Data Services, Inc. and other entities and business ventures.

7.    Slaine and Danziger have worked as a team and, to the knowledge of the plaintiffs, are united in numerous business ventures since at least 1984.

8.    As a director and officer of Rand, Slaine had a fiduciary duty to Rand and plaintiffs as shareholders of Rand not to appropriate to himself corporate opportunities in the information/publishing field and in particular the field of niche publications. As a director, officer and controlling shareholder of Rand, Slaine was and is a fiduciary of Rand and of all of its shareholders and owed and continues to owe them the duty to conduct the business of Rand candidly, loyally, faithfully, fairly and diligently. Slaine breached those duties.

9.    As a director and officer of Rand, and together with Slaine, a controlling shareholder, Danziger had a fiduciary duty to Rand and the plaintiffs as shareholders of Rand not to appropriate to himself or to secretly permit his friend and business partner, Slaine, to misappropriate corporate opportunities in the information/publishing field. As a director and officer of Rand, Danziger was and is a fiduciary of Rand and of all of its shareholders and owed and continues to owe them the duty to conduct the business of Rand candidly, loyally, faithfully, fairly and diligently. Danziger breached those duties.

10.    Slaine and Danziger appropriated to themselves the corporate opportunity to invest in Information Ventures LLC ("IV"), which was secretly established by Slaine with Warburg Pincus Ventures, L.P. in or about December 1996.

11.    Slaine's investment in IV did not exceed $1.663 million, well within the reach and means of Rand's ready capital at the time.

12.    The business of IV is in precisely the same line of business that Slaine and Danziger had agreed to pursue on behalf of Rand and the plaintiffs as investors in Rand.

13.    In breach of their fiduciary duty to plaintiffs, Slaine and Danziger misappropriated this corporate opportunity to themselves and for their own enrichment.

14.    After forming IV in December 1996, the defendants fraudulently told the plaintiffs that no proper investments were available to be made for Rand (Exhibit B) but instead purchased the properties for IV and for their own benefit.

15.    IV, reconstituted as Information Holdings, Inc. ("IHI") went public in August 1998 (Exhibit C).

16.    When IHI was to go public, because of the intimate relationship between Slaine and Danziger, and to reward Danziger for his assistance to Slaine, Slaine arranged for Danziger to become a member of the Board of Directors of IHI, a New York Stock Exchange Company and to receive various other benefits.

17.    Danziger has never before or after been a member of the board of directors of any New York Stock Exchange Company or any other public company other than IHI.

4

18.    As of July, 2001, IHI's stock is trading at approximately $30 a share; Danziger's stake in IHI is thus worth approximately $3 million and Slaine's stake should be worth approximately $70 million.

19.    Plaintiffs have not named IHI as a defendant at this point prior to their investigation being completed and discovery taking place, however, reserve the right to commence an action against IHI and to seek to recover from IHI any damages which they are unable to recover from Slaine and Danziger individually and from Warburg.

20.    Plaintiffs are entitled to the imposition of a constructive trust upon Slaine's and Danziger's proceeds realized from the initial public offering ("IPO") and any other benefits they received from IHI directly or indirectly, as well as any losses suffered by Rand or profits earned by Warburg and IHI from the improper conduct of Slaine and Danziger in misappropriating Rand's assets to benefit themselves, IHI and the co-defendant Warburg Pincus.

## JURISDICTION AND VENUE

21.    Jurisdiction of this Court is conferred by, among other things, the Agreement, which states in pertinent part in Paragraph 13:

> This Agreement shall be construed in accordance with the laws of the State of New York. All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of New York. Any action or proceeding arising out of or relating to this Agreement may only be brought in the State of New York and each party consents to the jurisdiction of the courts

5

of the State of New York, subject, however, to service of process.

22.    Venue is proper in that the Agreement was signed in New York, New York, all of the plaintiffs reside and/or are employed here.

### THE PARTIES

23.    Plaintiff Venturetek L.P. is a New York Limited partnership, whose address is 370 Lexington Avenue, New York, New York.

24.    Plaintiff Richard Elkin resides in West Windsor, New Jersey, and is employed in New York, New York.

25.    Plaintiffs Antoine Bernheim and Stacy Bernheim reside at 50 East 79 th Street, New York, New York.

26.    Plaintiff Genstar Ltd. is a Turks and Caicos corporation, whose address is c/o Dome Capital Management, Inc., 405 Park Avenue, New York, New York.

27.    All plaintiffs are currently shareholders of Rand and have been shareholders of Rand throughout the period of the wrongful conduct complained of herein.

28.    Nominal defendant Rand Publishing Co., Inc. a Delaware corporation, has and had at all relevant times its principal place of business at 263 Tresser Boulevard, Stamford, Connecticut 06901.

29.    Defendant Mason P. Slaine is a resident of Greenwich, Connecticut. For and on behalf of Rand, Slaine conducted business in the State and City of New York.

30.     Defendant Michael E. Danziger who is believed to be a resident of the State of New Jersey, conducted business in the City and State of New York.

31.     Defendant Warburg Pincus Ventures, L.P. is a limited partnership, organized under and by virtue of the laws of the State of New York with its principal place of business in the State of New York.

32.     E.M. Warburg, Pincus & Co., LLC is a New York limited liability company which manages Warburg Pincus which is the general partner of Warburg Pincus Ventures, LP.

## DERIVATIVE ALLEGATIONS

33.     Plaintiffs bring this action derivatively in the right of and for the benefit of Rand to redress injuries suffered and which continue to be suffered by Rand as a direct result of the defendants' wrongdoings.

34.     Plaintiffs will adequately and fairly represent the interests of Rand and its stockholders in enforcing and prosecuting their rights. There are no shareholders other than the plaintiffs and the individual defendants.

35.     This action is brought to remedy violations of applicable law.

36.     Plaintiffs have not made any demand on the present board of directors of Rand to institute this action because such demand would be a futile and useless act for the following reasons:

(a)    A majority of Rand's directors or former directors, to wit Slaine and Danziger, participated in or approved the acts or omissions or recklessly disregarded the wrongs which are complained of herein. Defendants Slaine and Danziger are the only officers of Rand and held two of the three seats on Rand's board of directors. They were both aware of and are the very persons accused of wrongdoing and failed to take any action on behalf of Rand to seek appropriate remedies, and the only independent director of Rand, in fact the only director who has not resigned or claimed he was going to resign (Exhibit D) Martin Bell, has authorized this lawsuit and directed that it be filed. Slaine and Danziger cannot be expected to bring suit against themselves.

(b)    i.    Slaine and Danziger have acted as a unit in numerous business ventures since 1984. In fact, since 1984 Danziger has not entered into any other business relationships other than one minor one in which Slaine was not involved, and since 1984 Slaine has not been involved in any business relationship which Danziger has not been involved in.

ii.    Danziger is the executor of Slaine's will and is the only individual who is an executor of Slaine's will.

iii.    Danziger is the trustee of a trust set up by Slaine for Slaine's son.

iv.    Slaine and Danziger were defendants in a lawsuit brought against them by their prior employer many years ago.

v. For some fifteen years, Slaine and Danziger and their entities have both been represented by the firm of Winthrop & Stimson, the firm now representing Rand, and by Francis Carling, who was previously with Winthrop & Stimson, and is now individually representing Slaine.

vi. During the seventeen years that Slaine and Danziger were associated, for much of that time Slaine was Danziger's supervisor and Danziger reported to Slaine.

vii. Danziger never asked Slaine as to what IV was bidding on to avoid competition between Rand and IV because he claimed to rely on Slaine's understanding of Slaine's fiduciary responsibilities.

viii. It was Slaine who arranged for Danziger – it is believed as a pay-off for permitting Slaine to purchase the properties that Rand should have purchased – to become a member of the board of IHI, a New York Stock Exchange company, and Danziger has never been a member of the board of any public company, particularly a New York Stock Exchange company, other than IHI, where Slaine arranged for Danziger to become a member of IHI's board.

ix. When Danziger met Slaine in 1984, Danziger was poor; because of his relationship with Slaine and the investments he and Slaine made together over the years, he has become a wealthy man.

x.      Slaine and Danziger had previously jointly walked the fine side

of business ethics and did so admittedly when they sought to buy a company from Capital

Cities Communications ("CCC"). When CCC refused to deal with Slaine and Danziger,

they used a company called Thompson as – to quote Danziger – a "Trojan horse." As

Danziger described it, they did not disclose to CCC that Thompson had agreed to sell the

business to Slaine and Danziger doing business as Rand as soon as it was purchased from

CCC.

xi.     Slaine admitted that he and Danziger formed a business in 1984

to compete with Danziger's then employer.

xii.    Danziger hired Slaine's half-brother to work for a company

where Danziger was an executive officer.

xiii.   Even after this lawsuit was filed, all Danziger did to investigate

if there was any wrongdoing by Slaine was to speak to Danziger's own lawyer.

xiv.    Slaine and Danziger are close friends and have spoken to each

other at least once a week for the past seventeen years, even after they were allegedly no

longer involved or associated with the same business other than each of them being a

member of IHI.

xv.     Danziger obviously cannot be trusted to diligently prosecute

a lawsuit against Slaine as a disinterested party.

xvi.    Slaine and Danziger are so interconnected that it would defy reality to believe that Danziger would bring any claim against Slaine and pursue it.

(c)    Slaine and Danziger admitted that they operated Rand in an informal manner, never observed any corporate formalities, never had any board meetings, never had annual elections for directors or officers, and have no board minutes. In light of this, even assuming – although as is clearly not the case – that Danziger is a disinterested party and could be expected to diligently prosecute a lawsuit against Slaine, his business associate for seventeen years, the issue of making a formal demand on the board of directors has been waived because Slaine and Danziger never operated Rand in a manner where corporate formalities were observed in any way. In fact, Slaine and Danziger have admitted they did not even know who the other directors were and as suited their convenience claimed that Martin Bell either was or was not a director, as suited their purpose at the moment.

(d)    Even assuming arguendo that Danziger is a disinterested party so far as Slaine is concerned, and it is clear that he is not, the only other independent director, Martin Bell, has indicated that a lawsuit should be brought on behalf of Rand; thus, even if Danziger were to find no claim was to be brought by Rand, at most there would be a deadlock between Bell and Danziger which still would permit this derivative lawsuit to go forward.

11

(e)     Slaine and Danziger have acted as a unit since at least 1984 in many of their business investments; Slaine has acted as Danziger's mentor; Slaine has arranged for Danziger to become a director of IHI and to receive various benefits as a director; Slaine and Danziger have been named as defendants in this lawsuit in which damages could exceed $100 million and thus have an absolute conflict of interest in seeking to absolve themselves from any liability by not bringing this lawsuit or seeking to prevent Rand and plaintiffs from bringing it; that the plaintiffs have reserved their right to bring a claim against IHI after discovery and it is discovered exactly what IHI's liability might be and what action it took or did not take and also dependent upon whether or no Danziger and Slaine are individually able to satisfy a judgment in favor of Rand; since Slaine and Danziger are both directors of IHI they have an absolute conflict of interest in seeking to avoid a lawsuit being brought which could involve IHI; Slaine and Danziger in their business transactions with these plaintiffs have always acted as a unit, in offering to jointly buy out the other investors in 1992 (Exhibit E, October 15, 1992), in obtaining employment agreements for themselves as a unit (Exhibit F, February 11, 1998), in cutting a deal for themselves with respect to Rand Communications, Inc. where they are treated as a unit (Exhibit G), in Slaine on February 1, 1993 (Exhibit H) referring to himself, his (Slaine's) brother and Mike Danziger as a unit with respect to an investment; in that Danziger is beholden to Slaine; in that Slaine was Danziger's mentor and arranged for him to receive millions of dollars such as from SDC where Danziger, due to Slaine's including

12