UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
RAND PUBLISHING CO., INC.,                              :
                                                        :
                              Plaintiff,                :        07 Civ. 9596 (VM)
                                                        :
            - against -                                 :
                                                        :
VENTURETEK, L.P., RICHARD ELKIN,                        :
ANTOINE BERNHEIM, STACY BERNHEIM                        :
and GENSTAR, LTD.,                                      :
                                                        :
                                                        :
                              Defendants.               :
-----------------------------------------------------------------------X

### DECLARATION OF JOSEPH B. CRACE, JR. IN SUPPORT OF DEFENDANTS ANTOINE BERNHEIM, STACY BERNHEIM, RICHARD ELKIN AND GENSTAR, LTD.'S MOTION TO DISMISS

Joseph B. Crace, Jr. declares under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.    I am admitted to practice before the United States District Court for the

Southern District of New York and an attorney with the law firm Shapiro Forman Allen Sava &

McPherson LLP, counsel to Defendants Antoine Bernheim, Stacy Bernheim, Richard Elkin and

Genstar, Ltd. (collectively, the "Defendants"). I respectfully submit this declaration in further

support of the Defendants' Motion to Dismiss the Complaint.

2.    True and correct copies of the following documents are attached hereto at

the following tabs:

| Tab | Description |
|-----|-------------|
| A   | The Agreement for Issuance and Sale of Stock, entered into on December 30, 1993 by Rand Publishing Company Inc., Venturetek L.P., Genstar, Ltd., Richard Elkin, Antoine and Stacy Bernheim, Mason Slaine, and Michael Danziger. |

B          The Complaint filed by Defendants in <u>Venturetek, L.P. v. Rand Publishing Co., Inc.</u>, Index No. 605046 (Sup. Ct. N.Y. County).

C          Relevant excerpts from Form 10-K filed with the Securities Exchange Commission by Information Holdings, Inc. on March 31, 2003.

D          A chart of historical post-IPO stock prices of Information Holdings, Inc. from August 6, 1998 to December 1, 1998.


Dated: December 12, 2007
       New York, New York


                              /s/ Joseph B. Crace, Jr.
                              Joseph B. Crace, Jr. (JC 6557)

Exhibit A

## AGREEMENT FOR ISSUANCE AND SALE OF STOCK

AGREEMENT made and entered into as of the 30th day of December, 1993, by and between RAND PUBLISHING COMPANY INC. a Delaware corporation, authorized in New York, with offices at 780 Third Avenue, New York, New York 10017 (the "Corporation"), VENTURETEK L.P., a New York limited partnership, whose address is that of its general partner, David Selengut, c/o Marvin Heiman, 25th Floor, 39 Broadway, New York, New York, GENSTAR LTD., a Turks and Caicos corporation, whose address is c/o Dome Capital Management Inc., 405 Park Avenue, New York, New York, Richard Elkin, c/o D.H. Blair & Co., 44 Wall Street, New York, New York 10005 and ANTOINE and STACY BERNHEIM, residing at 50 East 79th Street, New York, New York (collectively the "Investors"), and MASON SLAINE residing at 24 Rockwood Lane Spur, Greenwich, Connecticut, and MICHAEL DANZIGER residing at 7 Pollack Drive, Marlboro, New Jersey (collectively the "Shareholders").

Whereas, the Corporation desires to obtain additional funds to enable it to promote, develop and expand its facilities and its business, and

Whereas, the Investors are prepared to furnish and supply funds to the Corporation by subscribing to and purchasing shares of common stock of the Corporation, and

Whereas, the Corporation is authorized to issue one thousand (1,000) shares of common stock, no par value, (the "Stock"), and no other stock is currently authorized, and

Whereas, seventy two (72) of shares of Stock have been issued to Mason Slaine and are outstanding and held by him and seventy two (72) shares of Stock have been issued to Michael Danziger and are outstanding and held by him and said shares held by Mason Slaine and Michael Danziger are the only shares of Stock that have been issued or are outstanding, and

Whereas the Investors are willing to purchase one hundred and forty four (144) shares of stock of the Corporation for Three Million Six Hundred Thousand ($3,600,000.00) Dollars and the Corporation is willing to sell the Investors one hundred and forty four (144) of its shares at that price, said purchase and sale to be governed by the terms and conditions set forth in this Agreement,

Now, THEREFORE, in consideration of the foregoing, and of the mutual covenants, agreements, undertakings, representations, and warranties set forth below, it is agreed as follows:

1.  *Sale and purchase of shares.* Subject to the terms and conditions hereof and



EXHIBIT A

in reliance upon the representations and warranties, and the accomplishment and completion of the undertakings, set forth herein, the Corporation shall issue and sell to the Investors one hundred and forty four (144) shares of the Stock (the "Shares") as follows:

>    4 shares to Antoine and Stacy Bernheim
>    20 shares to Genstar Ltd.
>    118 shares to Venturetek L.P.
>    2 shares to Richard Elkin

The Investors shall purchase the Shares at the purchase price specified in paragraph 2 hereof. All of the Shares must be purchased.

2.    *Purchase Price.* The purchase price for the Shares is Twenty Five Thousand ($25,000.00) Dollars per share, for a total purchase price of Three Million Six Hundred Thousand ($ 3,600,000.00) Dollars for all of the Shares. The purchase price shall be paid as follows:

>    $100,000 by Antoine and Stacy Bernheim
>    $500,000 by Genstar Ltd.
>    $2,950,000 by Venturetek L.P.
>    $50,000.00 by Richard Elkin

3.    *Closing.* The closing of the sale and purchase of the Shares shall be held at the office of the Corporation, at 10:00 a.m. on January 5, 1994, (the "Closing Date"), or at any later time and date the Corporation and the Investors may agree upon. On the Closing Date, the Corporation shall deliver the Shares to the Investors against payment for the Shares by certified or bank check drawn upon or issued by and payable at a bank with regular banking offices in New York City, or by wire transfer to a bank account designated by the Corporation.

4.    *Representations, Warranties and Covenants of the Corporation and the Shareholders.* The Corporation and each of the Shareholders jointly and severally represents and warrants to, and agrees and covenants with the Investors that:

(a)    The Corporation was duly organized and is a validly existing corporation in good standing under the laws of the State of Delaware with full power and authority to own its properties and conduct the business in which it is now engaged. The Corporation also is duly qualified to do business and is in good standing in the State of New York.

(b)    On the Closing Date the aggregate number of shares of Stock of the Corporation that the Corporation shall be authorized to issue shall include the Shares being sold and bought under this Agreement. When issued and delivered as provided in this Agreement, all of these Shares shall be validly issued, fully paid and nonassessable.

(c)    This Agreement has been duly authorized, executed and delivered on behalf of the Corporation, and constitutes the valid and binding contract of the Corporation and each

of the Shareholders, enforceable in accordance with its terms. The Corporation has the full power and lawful authority to enter into this Agreement and to issue and sell the Shares on the terms and conditions set forth herein.

(d)     The consummation of the transactions contemplated hereby in compliance with the terms and provisions hereof will not conflict with, or result in a breach of any of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien, charge or encumbrance on any property or assets of the Corporation or either Shareholder pursuant to, any indenture, mortgage, deed of trust, agreement, corporate document, contract, or other instrument to which the Corporation or either Shareholder is a party or by which the Corporation or either Shareholder or their respective properties are bound.

(e)     There are no actions, suits or proceedings pending or, to the knowledge of the Corporation or either shareholder, threatened against the Corporation, its properties or its assets in any court or before any governmental or administrative agency that could have a material or adverse effect on the business of the Corporation as it is now conducted, on the properties of the Corporation, on the financial condition of the Corporation, or on the income of the Corporation, and the Corporation is not in default under any order, judgment or decree of any court or governmental or administrative agency.

(f)     The Corporation is not a party to any agreement or instrument, or subject to any charter, bylaw or other corporate restrictions materially or adversely affecting its business and operations, present or prospective, or its property, assets or condition, financial or otherwise.

(g)     The Corporation is not in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any bond, debenture, note, or other evidence of indebtedness or any contract or other agreement to which the Corporation is a party.

(h)     Prior to the Closing Date, the Corporation shall not declare or pay any dividend or make any other distribution on or with respect to its common stock.

(i)     Prior to the Closing Date, and for so long as Venturetek LP owns all the Shares transferred to Venturetek LP in accordance with this Agreement, the Corporation shall not issue any shares or equity interests of any kind without Venturetek LP's written consent.

(j)     For so long as the Investors collectively own twenty percent (20%) or more of the outstanding shares of the Corporation, the Corporation may not be dissolved or dividends declared without the unanimous consent of the Investors and Danziger and Slaine shall remain actively involved in the affairs of the Corporation, to the extent that they deem appropriate to develop the business.

(k)     On the Closing Date, one person nominated by Venturetek L.P. shall be elected as a member of the board of directors of the Corporation. For so long as Venturetek LP

is the owner of all the Shares transferred to Venturetek LP in accordance with this Agreement, Venturetek L.P. shall nominate one person who shall be elected as a member of the board of directors of the Corporation and no more than three persons shall constitute the board of directors of the Corporation.

(l)    For so long as the Venturetek LP owns all the Shares transferred to Venturetek LP in accordance with this Agreement, the Corporation shall maintain and pay for renewable term life insurance on Michael Danziger in the face amount of at least $1,000,000 and on Mason Slaine in the face amount of at least $2,000,000, each policy having the Corporation named as primary beneficiary and each subject to no liens, encumbrances or assignments of any kind.

(m)    For so long as Venturetek LP owns all of the shares transferred to Venturetek LP in accordance with this Agreement, the salaries and other compensation of the Shareholders shall not be increased without Venturetek LP's written consent.

5.    *Current Business*. Investors are aware that the sole current business of the Corporation is the publishing of a periodical known as Financial Technology Review. The Investors are further aware that only one issue of that periodical has been published. No representations have been made regarding the profitability of that publication.

6.    *Conditions Precedent to Investors' Obligation*. The Investors shall be under no obligation to purchase the Shares as contemplated by this Agreement unless on or prior to the Closing Date the Corporation has performed all of its agreements and undertakings hereunder on or prior to that time, and the following additional conditions have been fulfilled:

(a)    On or prior to the Closing Date, the Investors shall have received the opinion of the Corporation's counsel, Turchin & Hoffman, P.C., dated as of the Closing Date, addressed to the Investors and in form and substance satisfactory to the Investors to the effect that:

(1)    The Corporation was duly organized and is a validly existing corporation in good standing under the laws of the State of Delaware with full power and authority to own its properties and conduct the business in which it is now engaged, and is duly qualified to do business as a foreign corporation and is in good standing in New York;

(2)    This Agreement has been duly authorized, executed and delivered on behalf of the Corporation and the Shareholders, and constitutes the valid and binding agreement of the Corporation and each of the Shareholders, enforceable in accordance with its terms;

(3)    The Corporation is duly authorized to issue and

he

Oct-30-07  01:46pm  From-D.H.BLAIR  Case 1:07-cv-09596-VM   Document 12   Filed 11/02/2007   Page 8 of 58   F-890

sell the Shares, and the Shares when issued and sold in accordance
with the terms of this Agreement shall be validly issued, and
nonassessable, and the shares of the Corporation's outstanding
capital stock now are, validly issued fully paid and nonassessable;
and

(4)   The making of this Agreement and the
issuance and delivery of the Shares purchased under and pursuant
to this Agreement constitute an exempt transaction under the
Securities Act of 1933, as amended; and the issuance and delivery of
the Shares purchased under and pursuant to this Agreement, and the
performance of this Agreement, are in conformity with the securities
laws of all applicable states.

The opinion shall also encompass whatever other legal matters the Investors may
reasonably request.

(b)   The representations and warranties of the Corporation and the
Shareholders set forth in subparagraphs (a) to (m), inclusive, paragraph 4 hereof, shall be true at
the Closing Date with the same effect as though they had been made by the Corporation and the
Shareholders at that time, and the Investors shall receive a satisfactory certificate signed by the
President or a vice-president of the Corporation and by each shareholder to that effect.

(c)   All proceedings taken at or prior to the Closing Date in connection
with the transactions contemplated in this Agreement and all instruments, authorizations,
certificates, and other documents applicable hereto shall be satisfactory in form and substance to
the Investors and to their counsel, and the Investors and their counsel shall have received copies
of all of such documents that they may reasonably request.

(d)   The Investors represent that they have been fully appraised of, and are
totally aware of the nature of the investment being made and the financial risks of the investment.
In addition, the Investors have been offered access to all of the Corporation's books, records,
information, agreement and documents that they have deemed necessary and appropriate under
the circumstances. The Investors do not require or desire any information or data pertaining to the
Corporation.

7.   *Representations and Warranties of the Investors.*

(a)   Each Investor represents and warrants to, and agrees with the
Corporation, that such Investor is purchasing the Shares for its own account, for investment, and that
it has no present intention of distributing or reselling any of the Shares, including but not limited to
any distribution to the partners of Venturetek L.P. or the shareholders of Genstar Ltd.

Page 5 of an 11 Page Agreement

(b)     Venturetek L.P. represents and warrants that the general partner of Venturetek L.P. is David Selengut with offices at c/o Marvin Heiman, 25th Floor, 39 Broadway, New York, New York 10013. Venturetek L.P. agrees that, except pursuant to Paragraph 8 of this Agreement, without the prior written consent of the Corporation, it will not windup, liquidate its affairs, dissolve, or distribute, assign, sell, transfer, hypothecate, or pledge the Shares.

(c)     Venturetek L.P. agrees that the Corporation may deal with it through the general partner and that notices to and agreements by the general partner will be binding on Venturetek L.P.

(d)     Genstar Ltd., Antoine and Stacy Bernheim and Richard Elkin agree that they will not distribute, assign, sell, transfer, hypothecate, or pledge the Shares except pursuant to Paragraph 8 of this Agreement without the prior written consent of the Corporation.

8.     *Registration Rights.* If the Corporation or any of its shareholders shall at any time or times determine to register under the Securities Act of 1933 (the "Securities Act") any Shares or other securities of the Corporation (other than the registration of an offer and sale of securities to employees of the Corporation pursuant to an employee or similar benefit plan, registered on Form S-8 or comparable form; or a registration relating to a merger, acquisition or other transaction of the type described in Rule 145 or comparable rule, on Form S-4 or similar form), the Corporation will give written notice thereof to the Investors.

(a)     The Corporation's notice shall afford the Investors an opportunity to elect within 30 days after receipt thereof to include in such filing all or any part of the Shares of the Corporation owned by it. If the aggregate number of Shares that the Investors desire to include in such filing exceeds the number of permissible shares to be offered as determined by the representative of the underwriter, then the Investors shall be entitled to include that number of Shares that bears the same ratio to the number of permissible shares as the number of Shares the Investors desire to include bears to the sum of the number of shares the Corporation proposes to register and the number of Shares all shareholders desire to include. Such representative may increase or decrease the number of permissible shares at any time until all shares included in such registration shall have been sold by such underwriters.

(b)     The inclusion in such filing of shares of the Corporation held by the Investors shall be upon the condition that the investors sell their respective Shares to the underwriters on the same terms and conditions as the Corporation and other selling Shareholders.

9.     *Come-Along.* The Shareholders agree that no sale or transfer of their Shares in the Corporation will be made by them, unless the Investors, and each of them, shall be afforded the opportunity to sell or transfer to the transferee, on terms and conditions at least as favorable as to the Shareholders, a percentage of the Investors' Shares. The percentage of Shares to be sold or

transferred shall be derived by dividing the number of Shares in the Corporation which the transferee agrees to acquire or purchase by the total number of shares in the Corporation which all shareholders desire to sell or transfer but in no event shall the percentage exceed 100%.

10.     *Provisions to Survive Delivery.* The representations, warranties, covenants, understandings, agreements, and other statements of the Corporation and the Investors expressly set forth in this Agreement shall survive delivery of, and payment for, the Shares.

11.     *Furnishing of Information.* The Corporation covenants that as long as an Investor holds any of the Shares, the Corporation shall furnish such Investor whatever information concerning the business, affairs and financial condition of the Corporation the Investor may reasonably request, and the Investor or its representative, upon reasonable notice, may visit and inspect any of the properties and examine any of the books and records of the Corporation, and the Corporation shall provide to such Investor quarterly unaudited balance sheets and statements of income and expenses.

12.     *Securities Legend.* The certificates representing the Shares delivered to the Investors under and pursuant to this Agreement shall bear a legend in substantially the following form:

> The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state. The securities have been acquired for investment and may not be sold, offered for sale or transferred in the absence of an effective registration under the Securities Act of 1933, as amended, and any applicable state securities laws, or an opinion of counsel satisfactory in form and substance to counsel for the Corporation that the transaction shall not result in a violation of federal or state securities laws.

> The shares represented by this certificate are subject to an Agreement among the Corporation and the shareholders of the Corporation. That agreement, which is available for inspection at the offices of the Corporation, places certain restrictions on the transfer of the shares of the Corporation.

The Shareholders represent that the foregoing legend appears on the certificates for the shares owned by the Shareholders.

Page 7 of an 11 Page Agreement

13.    *Governing Law and Litigation.* This Agreement shall be construed in accordance with the laws of the State of New York. All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of New York. Any action or proceeding arising out of or relating to this Agreement may only be brought in the State of New York and each party consents to the jurisdiction of the Courts of the State of New York, subject, however, to the proper service of process. GENSTAR hereby designates Dome Capital Management Inc., at the above address, as its agent for service of process. Venturetek LP hereby designates Martin Hieman, at the above address, as its agent for service of process.

14.    *Assignment.* Neither this Agreement nor any interest of any party herein may be assigned, pledged or transferred without the parties' prior written consent.

15.    *Binding Effect.* This Agreement inures to the benefit of, and is binding upon, the parties hereto, and their respective heirs, representatives, successors, assigns, and controlling person, but nothing herein shall be construed as an authorization or right of any party to assign its rights and obligations hereunder. A successor or an assign does not include a purchaser of the common stock of the Corporation solely by reason of that purchase.

16.    *Waiver.* No waiver of any provision hereof is valid unless it is in writing and signed by the person against whom it is charged.

17.    *Notice.* All notices under this Agreement must be in writing addressed to the person at the address specified herein, or at an address changed in this manner.

18.    *Entire Agreement.* This Agreement constitutes the entire contract between the parties with respect to the subject matter of the Agreement. Neither party has relied on any representations not explicitly set forth in this Agreement.

19.    *Amendment.* This Agreement may not be amended, modified, or changed except in a writing signed by the parties.

20.    *Indemnification.*

(a) Subject to the terms and limitations set forth in Section 20 (b) below:

(i) The Corporation and each Shareholder shall jointly and severally indemnify, defend and hold harmless each Investor and their respective general and limited partners, shareholders, officers, agents and representatives, from and against any and all claims,

penalties, fines, sanctions, demands, suits, losses, liabilities, damages, obligations, payments, costs and expenses, paid or incurred, whether or not relating to, resulting from or arising out of any Third Party Claim or any Direct Claim (each as defined in Section 20(b) below) (including, without limitation, the reasonable costs and expenses of any and all actions, suits, proceedings, demands, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees in connection therewith) (individually and collectively "Indemnifiable Losses") relating to. resulting from or arising out of: (A) any breach of any of the representations warranties or covenants of the Corporation or the Shareholders contained in this Agreement or any of the other agreements contemplated hereby, and/or (B) the operation of the Corporation.

(ii)  Each Investor shall indemnify, defend and hold harmless the Corporation and each Shareholder and each of their successors and assigns, from and against any and all Indemnifiable Losses relating to, resulting from or arising out of any breach of any of the representations, warranties or covenants of such Investor contained in this Agreement or any of the other agreements contemplated hereby.

(iii)  For purposes of this Agreement, "Indemnity Payment" shall mean any amounts of Indemnifiable Losses required to be paid pursuant to this Section 20 (a).

(iv)  For purposes of this Agreement, "Indemnitee" shall mean any person, entity or group entitled to indemnification under this Agreement.

(v)  For purposes of this Agreement, "Indemnifying Party" shall mean any person, entity or group required to provide indemnification under this Agreement.

(b):  (i) If an Indemnitee receives notice of the assertion of any claim or of the commencement of any action or proceeding by any person, entity or group (a "Third Party Claim") against such Indemnitee, with respect to which an Indemnifying Party is obligated to provide indemnification under Section 20(a) above, the Indemnitee shall give such Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after receipt of such notice of such Third Party Claim. Such notice shall describe the Third Party Claim in reasonable detail, and shall indicate the estimated amount, if practicable, of the Indemnifiable Loss that has or may be sustained by the Indemnitee. The Indemnifying Party shall have the right to participate in or, by giving written notice to the Indemnitee, to elect to assume the defense of any Third Party claim at such Indemnifying Party's own expense and by such Indemnifying Party's own counsel (reasonably satisfactory to the Indemnitee), and the Indemnitee shall cooperate in good faith in such defense.

(ii) If within 10 calendar days after an Indemnitee receives written notice from an Indemnifying Party that such Indemnifying Party has elected to assume the defense of any Third Party Claim as provided in the last sentence of Section 20 (b) (i) above, the Indemnifying Party shall not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the

defense thereof; provided, however, that if the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim within 10 calendar days after receiving notice from the Indemnitee that the Indemnitee believes the Indemnifying Party has failed to take such steps, the Indemnitee may assume its own defense, and the Indemnifying Party shall be liable for any reasonable expenses therefor. Without the prior written consent of the Indemnitee, the indemnifying Party shall not enter into any settlement of the Third Party Claim which would lead to liability or create any financial or other obligation on the part of the Indemnitee for which the Indemnitee is not entitled to reimbursement hereunder.

(iii)   Any claim by an Indemnitee on account of any Indemnifiable Loss which does not result from a Third Party Claim (a "Direct Claim") shall be asserted by giving the Indemnifying Party reasonably prompt written notice thereof, but in any event not later than 30 calendar days after the Indemnitee becomes aware of such Direct Claim, and the Indemnifying Party shall have a period of 30 calendar days within which to respond to such Direct Claim. If the Indemnifying Party does not so respond within such 30 calendar day period, the Indemnifying Party shall be deemed to have rejected such claim in which event the Indemnitee shall be free to pursue such remedies as may the available to the Indemnitee under any applicable Laws, subject to the terms of this Agreement, including, without limitation, the enforcement of the Indemnitee's Rights under this Agreement.

(iv)   A failure to give timely notice as provided in this Section 20 (b) shall not affect the rights or obligations of any party hereunder except and only to the extent that, as a result of such failure, any party which was entitled to receive such notice was deprived of its right to recover any payment under its applicable insurance coverage or incurred an obligation or liability which otherwise would have been avoided.

(v)   Upon making any Indemnity Payment the Indemnifying Party shall, to the extent of such Indemnity Payment, be subrogated to all rights of the Indemnitee against any third party in respect of the Indemnifiable Loss to which the Indemnity Payment related; provided, however, that (i) the Indemnifying Party shall then be in compliance with its obligations under this Agreement in respect of such Indemnifiable Loss, and (ii) until the Indemnitee recovers full payment of its Indemnifiable Loss, any and all claims of the Indemnifying Party against any such third party on account of said Indemnity Party is hereby made expressly subordinated and subjected in right of payment to tale Indemnitee's rights against such third party. Without limiting the generality of any other provision hereof, each such Indemnitee and Indemnifying Party shall duly execute upon request all instruments reasonably necessary to evidence and perfect the above-described subrogation and subrogation rights.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day, month and year first written above.

RAND PUBLISHING COMPANY INC.

By: _____
    President

_____
ANTOINE BERNHEIM

_____
STACY BERNHEIM

GENSTAR LTD.

By: _____

VENTURETEK L.P.

By: _____
    General Partner

_____
MICHAEL DANZIGER

_____
MASON SLAINE

_____
Richard Elkin

Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

VENTURETEK, L.P., RICHARD ELKIN, ANTOINE
BERNHEIM, STACY BERNHEIM, and GENSTAR,
LTD., derivatively as shareholders of Rand Publishing
Co., Inc.,

                                                    Plaintiffs,

            -against-

RAND PUBLISHING COMPANY, INC., MASON P.
SLAINE, MICHAEL E. DANZIGER, WARBURG PINCUS
VENTURES, L.P. and E.M. WARBURG, PINCUS
& CO., LLC,

                                                    Defendants.

-------------------------------------------------------------------------x

Index No. 605046/98    6o5o46/98

**SECOND  VERIFIED
AMENDED COMPLAINT**

Plaintiffs, by their attorneys, Jaroslawicz & Jaros, make the following allegations

upon information and belief, except for the allegations as to the facts concerning plaintiffs

themselves, which are based upon personal knowledge.

## NATURE OF ACTION

1.      Pursuant to the written Agreement for Issuance and Sale of Stock

("Agreement") attached hereto (Exhibit A), plaintiffs invested $3.6 million in January 1994

to jointly acquire a fifty-percent (50%) interest in Rand Publishing Company, Inc. ("Rand").

2.      The investment was based on the representation of the defendants Mason

Slaine ("Slaine") and Michael E. Danziger ("Danziger")that Slaine and Danziger would

remain actively involved in the affairs of the corporation and that, Slaine, as chairman of

the board and Danziger as an officer of Rand, they would devote themselves to pursuing

and acquiring suitable information/publishing investments for the shareholders' $3.6 million and would concentrate on niche publications; see Exhibit A, sub-division 4(j).

3.      Slaine and Danziger represented that they would diligently pursue the acquisition of suitable publications for Rand which was the major purpose of the plaintiffs' investment into Rand. Plaintiffs also acquired the right to nominate one of three members of Rand's board of directors and did appoint Martin Bell as a director of Rand.

4.      Slaine's expertise and experience in the publishing field and his representation that he would investigate and make suitable information/ publishing investments for Rand constituted Slaine's contribution to Rand and the basis for (i) permitting him, without him making any further monetary investment, to retain (25%) percent of the stock of Rand and to hold one of three seats on Rand's board of directors, and for (ii) permitting Slaine's friend, business associate and alter-ego, co-defendant, Danziger ("Danziger"), to hold a second seat and to retain the remaining 25% of Rand stock. The Agreement also specifically provided that so long as plaintiffs held 20% of Rand's stock, "Danziger and Slaine shall remain actively involved in the affairs of the Corporation [Rand], to the extent that they deem appropriate to develop the business" (Exhibit A, 4(j).

5.      Slaine and Danziger as a unit had previously been involved in related business ventures with some of the same plaintiffs since at least 1987, including, among others, companies known as Rand Communications, Inc., Rand Data Services, Inc. and Rand Capital Corp.

2

6.     To plaintiffs' knowledge, Slaine and Danziger have worked together since at least 1984, with Slaine acting as Danziger's mentor and Slaine and Danziger would act as the active officers of Rand Communications Inc., Rand Data Services, Inc. and other entities and business ventures.

7.     Slaine and Danziger have worked as a team and, to the knowledge of the plaintiffs, are united in numerous business ventures since at least 1984.

8.     As a director and officer of Rand, Slaine had a fiduciary duty to Rand and plaintiffs as shareholders of Rand not to appropriate to himself corporate opportunities in the information/publishing field and in particular the field of niche publications. As a director, officer and controlling shareholder of Rand, Slaine was and is a fiduciary of Rand and of all of its shareholders and owed and continues to owe them the duty to conduct the business of Rand candidly, loyally, faithfully, fairly and diligently. Slaine breached those duties.

9.     As a director and officer of Rand, and together with Slaine, a controlling shareholder, Danziger had a fiduciary duty to Rand and the plaintiffs as shareholders of Rand not to appropriate to himself or to secretly permit his friend and business partner, Slaine, to misappropriate corporate opportunities in the information/publishing field. As a director and officer of Rand, Danziger was and is a fiduciary of Rand and of all of its shareholders and owed and continues to owe them the duty to conduct the business of Rand candidly, loyally, faithfully, fairly and diligently. Danziger breached those duties.

3

10.    Slaine and Danziger appropriated to themselves the corporate opportunity to invest in Information Ventures LLC ("IV"), which was secretly established by Slaine with Warburg Pincus Ventures, L.P. in or about December 1996.

11.    Slaine's investment in IV did not exceed $1.663 million, well within the reach and means of Rand's ready capital at the time.

12.    The business of IV is in precisely the same line of business that Slaine and Danziger had agreed to pursue on behalf of Rand and the plaintiffs as investors in Rand.

13.    In breach of their fiduciary duty to plaintiffs, Slaine and Danziger misappropriated this corporate opportunity to themselves and for their own enrichment.

14.    After forming IV in December 1996, the defendants fraudulently told the plaintiffs that no proper investments were available to be made for Rand (Exhibit B) but instead purchased the properties for IV and for their own benefit.

15.    IV, reconstituted as Information Holdings, Inc. ("IHI") went public in August 1998 (Exhibit C).

16.    When IHI was to go public, because of the intimate relationship between Slaine and Danziger, and to reward Danziger for his assistance to Slaine, Slaine arranged for Danziger to become a member of the Board of Directors of IHI, a New York Stock Exchange Company and to receive various other benefits.

17.    Danziger has never before or after been a member of the board of directors of any New York Stock Exchange Company or any other public company other than IHI.

4

18.    As of July, 2001, IHI's stock is trading at approximately $30 a share; Danziger's stake in IHI is thus worth approximately $3 million and Slaine's stake should be worth approximately $70 million.

19.    Plaintiffs have not named IHI as a defendant at this point prior to their investigation being completed and discovery taking place, however, reserve the right to commence an action against IHI and to seek to recover from IHI any damages which they are unable to recover from Slaine and Danziger individually and from Warburg.

20.    Plaintiffs are entitled to the imposition of a constructive trust upon Slaine's and Danziger's proceeds realized from the initial public offering ("IPO") and any other benefits they received from IHI directly or indirectly, as well as any losses suffered by Rand or profits earned by Warburg and IHI from the improper conduct of Slaine and Danziger in misappropriating Rand's assets to benefit themselves, IHI and the co-defendant Warburg Pincus.

## JURISDICTION AND VENUE

21.    Jurisdiction of this Court is conferred by, among other things, the Agreement, which states in pertinent part in Paragraph 13:

> This Agreement shall be construed in accordance with the laws of the State of New. York. All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of New York. Any action or proceeding arising out of or relating to this Agreement may only be brought in the State of New York and each party consents to the jurisdiction of the courts

5

of the State of New York, subject, however, to service of process.

22.    Venue is proper in that the Agreement was signed in New York, New York, all of the plaintiffs reside and/or are employed here.

## THE PARTIES

23.    Plaintiff Venturetek L.P. is a New York Limited partnership, whose address is 370 Lexington Avenue, New York, New York.

24.    Plaintiff Richard Elkin resides in West Windsor, New Jersey, and is employed in New York, New York.

25.    Plaintiffs Antoine Bernheim and Stacy Bernheim reside at 50 East 79 th Street, New York, New York.

26.    Plaintiff Genstar Ltd. is a Turks and Caicos corporation, whose address is c/o Dome Capital Management, Inc., 405 Park Avenue, New York, New York.

27.    All plaintiffs are currently shareholders of Rand and have been shareholders of Rand throughout the period of the wrongful conduct complained of herein.

28.    Nominal defendant Rand Publishing Co., Inc. a Delaware corporation, has and had at all relevant times its principal place of business at 263 Tresser Boulevard, Stamford, Connecticut 06901.

29.    Defendant Mason P. Slaine is a resident of Greenwich, Connecticut. For and on behalf of Rand, Slaine conducted business in the State and City of New York.

6

30.     Defendant Michael E. Danziger who is believed to be a resident of the State of New Jersey, conducted business in the City and State of New York.

31.     Defendant Warburg Pincus Ventures, L.P. is a limited partnership, organized under and by virtue of the laws of the State of New York with its principal place of business in the State of New York.

32.     E.M. Warburg, Pincus & Co., LLC is a New York limited liability company which manages Warburg Pincus which is the general partner of Warburg Pincus Ventures, LP.

## DERIVATIVE ALLEGATIONS

33.     Plaintiffs bring this action derivatively in the right of and for the benefit of Rand to redress injuries suffered and which continue to be suffered by Rand as a direct result of the defendants' wrongdoings.

34.     Plaintiffs will adequately and fairly represent the interests of Rand and its stockholders in enforcing and prosecuting their rights. There are no shareholders other than the plaintiffs and the individual defendants.

35.     This action is brought to remedy violations of applicable law.

36.     Plaintiffs have not made any demand on the present board of directors of Rand to institute this action because such demand would be a futile and useless act for the following reasons:

7

(a)    A majority of Rand's directors or former directors, to wit Slaine and Danziger, participated in or approved the acts or omissions or recklessly disregarded the wrongs which are complained of herein. Defendants Slaine and Danziger are the only officers of Rand and held two of the three seats on Rand's board of directors. They were both aware of and are the very persons accused of wrongdoing and failed to take any action on behalf of Rand to seek appropriate remedies, and the only independent director of Rand, in fact the only director who has not resigned or claimed he was going to resign (Exhibit D) Martin Bell, has authorized this lawsuit and directed that it be filed. Slaine and Danziger cannot be expected to bring suit against themselves.

(b)    i.    Slaine and Danziger have acted as a unit in numerous business ventures since 1984. In fact, since 1984 Danziger has not entered into any other business relationships other than one minor one in which Slaine was not involved, and since 1984 Slaine has not been involved in any business relationship which Danziger has not been involved in.

ii.    Danziger is the executor of Slaine's will and is the only individual who is an executor of Slaine's will.

iii.    Danziger is the trustee of a trust set up by Slaine for Slaine's son.

iv.    Slaine and Danziger were defendants in a lawsuit brought against them by their prior employer many years ago.

8

v.    For some fifteen years, Slaine and Danziger and their entities have both been represented by the firm of Winthrop & Stimson, the firm now representing Rand, and by Francis Carling, who was previously with Winthrop & Stimson, and is now individually representing Slaine.

vi.    During the seventeen years that Slaine and Danziger were associated, for much of that time Slaine was Danziger's supervisor and Danziger reported to Slaine.

vii.    Danziger never asked Slaine as to what IV was bidding on to avoid competition between Rand and IV because he claimed to rely on Slaine's understanding of Slaine's fiduciary responsibilities.

viii.    It was Slaine who arranged for Danziger – it is believed as a pay-off for permitting Slaine to purchase the properties that Rand should have purchased – to become a member of the board of IHI, a New York Stock Exchange company, and Danziger has never been a member of the board of any public company, particularly a New York Stock Exchange company, other than IHI, where Slaine arranged for Danziger to become a member of IHI's board.

ix.    When Danziger met Slaine in 1984, Danziger was poor; because of his relationship with Slaine and the investments he and Slaine made together over the years, he has become a wealthy man.

9

x.      Slaine and Danziger had previously jointly walked the fine side of business ethics and did so admittedly when they sought to buy a company from Capital Cities Communications ("CCC"). When CCC refused to deal with Slaine and Danziger, they used a company called Thompson as – to quote Danziger – a "Trojan horse." As Danziger described it, they did not disclose to CCC that Thompson had agreed to sell the business to Slaine and Danziger doing business as Rand as soon as it was purchased from CCC.

xi.      Slaine admitted that he and Danziger formed a business in 1984 to compete with Danziger's then employer.

xii.     Danziger hired Slaine's half-brother to work for a company where Danziger was an executive officer.

xiii.    Even after this lawsuit was filed, all Danziger did to investigate if there was any wrongdoing by Slaine was to speak to Danziger's own lawyer.

xiv.     Slaine and Danziger are close friends and have spoken to each other at least once a week for the past seventeen years, even after they were allegedly no longer involved or associated with the same business other than each of them being a member of IHI.

xv.      Danziger obviously cannot be trusted to diligently prosecute a lawsuit against Slaine as a disinterested party.

10

xvi.    Slaine and Danziger are so interconnected that it would defy reality to believe that Danziger would bring any claim against Slaine and pursue it.

(c)    Slaine and Danziger admitted that they operated Rand in an informal manner, never observed any corporate formalities, never had any board meetings, never had annual elections for directors or officers, and have no board minutes. In light of this, even assuming – although as is clearly not the case – that Danziger is a disinterested party and could be expected to diligently prosecute a lawsuit against Slaine, his business associate for seventeen years, the issue of making a formal demand on the board of directors has been waived because Slaine and Danziger never operated Rand in a manner where corporate formalities were observed in any way. In fact, Slaine and Danziger have admitted they did not even know who the other directors were and as suited their convenience claimed that Martin Bell either was or was not a director, as suited their purpose at the moment.

(d)    Even assuming arguendo that Danziger is a disinterested party so far as Slaine is concerned, and it is clear that he is not, the only other independent director, Martin Bell, has indicated that a lawsuit should be brought on behalf of Rand; thus, even if Danziger were to find no claim was to be brought by Rand, at most there would be a deadlock between Bell and Danziger which still would permit this derivative lawsuit to go forward.

11

(e)    Slaine and Danziger have acted as a unit since at least 1984 in many

of their business investments; Slaine has acted as Danziger's mentor; Slaine has arranged

for Danziger to become a director of IHI and to receive various benefits as a director;

Slaine and Danziger have been named as defendants in this lawsuit in which damages

could exceed $100 million and thus have an absolute conflict of interest in seeking to

absolve themselves from any liability by not bringing this lawsuit or seeking to prevent

Rand and plaintiffs from bringing it; that the plaintiffs have reserved their right to bring

a claim against IHI after discovery and it is discovered exactly what IHI's liability might

be and what action it took or did not take and also dependent upon whether or no

Danziger and Slaine are individually able to satisfy a judgment in favor of Rand; since

Slaine and Danziger are both directors of IHI they have an absolute conflict of interest in

seeking to avoid a lawsuit being brought which could involve IHI; Slaine and Danziger in

their business transactions with these plaintiffs have always acted as a unit, in offering to

jointly buy out the other investors in 1992 (Exhibit E, October 15, 1992), in obtaining

employment agreements for themselves as a unit (Exhibit F, February 11, 1998), in cutting

a deal for themselves with respect to Rand Communications, Inc. where they are treated

as a unit (Exhibit G), in Slaine on February 1, 1993 (Exhibit H) referring to himself, his

(Slaine's) brother and Mike Danziger as a unit with respect to an investment; in that

Danziger is beholden to Slaine; in that Slaine was Danziger's mentor and arranged for him

to receive millions of dollars such as from SDC where Danziger, due to Slaine's including

12

him in the deal, received nearly $5 million (Exhibit I); Slaine arranged for Danziger to purchase securities in IHI and obtain other benefits worth in excess of $3 million, as well as to become a director of IHI; Slaine and Danziger are as inseparable as siamese twins and it would defy reality to believe that Danziger would do anything to hurt his friend and mentor, Slaine, who has helped him make millions of dollars and who has invited him to participate in the spoils gained individually to Slaine through the IHI venture.

(f)    In order to attempt to prevent the lawsuit, Slaine and Danziger have fabricated a claim that Bell, at a meeting in July 1998, agreed that Danziger was an independent director who could and should decide if an action should be brought against Slaine. This is pure fabrication.

(g)    Slaine and Danziger claimed on September 11, 1998 (Exhibit D) that they were resigning as officers and directors of Rand. If, in fact, they did resign, they have no standing as directors. If the representation they made that they were resigning was false and they now claim to have remained as directors, then if they were going to vote, the two of them would control Rand and obviously would not vote to bring a lawsuit against themselves. The only independent director, and only director who has not resigned, Martin Bell, has directed that this lawsuit be brought and include Danziger as a defendant.

(h)    Slaine and Danziger, the known wrongdoers and beneficiaries of the wrongdoing complained of herein, are in a position to, and do and did, dominate and control the board of directors of Rand until they claimed to resign on September 11, 1998.

13

Defendants Slaine and Danziger were responsible for the breach of their fiduciary duties and usurpation of corporate opportunities complained of herein.

(i)    According to Exhibit C, Slaine received at least 2,379,563 shares of IHI as well as options and other benefits, and Danziger received 91,106 shares of IHI and became a director of IHI.

(j)    Thus, Rand's board of directors, assuming Slaine and Danziger were part of it in October 1998 and now claim not to have resigned in September 1998, could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action.

(k)    A majority of Rand's directors participated in, acquiesced in, and approved the wrongs alleged herein, and did so in affirmative violation of their duties to Rand and its stockholders and have permitted the wrongs alleged and/or have remained inactive although they had had knowledge or notice of those wrongs. Slaine and Danziger, as the only inside members of the Company's board of directors, throughout the relevant period, knew of the wrongdoing alleged herein but failed to take the appropriate steps to prevent harm to Rand and its shareholders. In fact, Slaine and Danziger were the wrongdoers.

(l)    Because of their participation in the usurpation of corporate opportunities and breach of fiduciary duties, the directors, if in fact Slaine and Danziger did not resign as they claimed they did (Exhibit D), are in no position to prosecute this

14

action. Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action. Neither Slaine nor his friend and associate Danziger could or would prosecute an action on behalf of Rand and its shareholders against Slaine and Danziger, in essence themselves, for the wrongdoing alleged herein. Neither Slaine nor Danziger nor their attorneys could be expected to carry out such a task in an impartial manner and the only other director, Martin Bell, has approved of the lawsuit to be brought.

(m)    Slaine and Danziger, who controlled the board of Rand, assuming they now claim not to have resigned on September 11, 1998 (Exhibit D), cannot defend their actions by any alleged "'independent" business judgment since each of them is responsible for the present financial and operational circumstances of Rand, acted with gross negligence, acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to Rand and its stockholders and failed to act and abdicated their functions and duties as directors and officers of Rand.

(n)    Slaine and Danziger are now seeking to cover up their fraudulent conduct and to conceal what had occurred by seeking to liquidate and dissolve Rand (Exhibit D).

(o)    The only remaining and independent director, Martin Bell, has specifically authorized this lawsuit to be brought and to include Danziger as a defendant.

(p)    If Rand is required to name IHI as a defendant following discovery from Slaine, Danziger and others, which it is anticipated may occur, Slaine and Danziger

15

would have a direct conflict of interest and it would therefore behoove them to prevent any lawsuit being brought against IHI in order to protect themselves and IHI of which they are now substantial shareholders and directors.

        (q)    Slaine and Danziger -- as defendants in this action, where the plaintiffs are seeking to recover damages suffered by Rand, to wit, among other alternatives, profits received by IHI from purchasing the publishing entities, including the niche publishing businesses, which rightfully belonged to Rand, and to have Slaine and Danziger turn over their shares to Rand, as well as any other benefits they received from IHI – would have a direct conflict of interest because they would in essence be asked to bring a lawsuit against themselves and therefore any demand on them to do so would be completely futile.

### SLAINE'S AND DANZIGER'S WRONGFUL COURSE OF CONDUCT

37.    On December 30,1993, plaintiffs, Mason Slaine and Michael Danziger entered into the Agreement (Exhibit A) with Rand and the plaintiffs.

38.    Pursuant to the Agreement, on January 4, 1994, plaintiffs purchased 144 shares of Rand stock for \$3.6 million, thus acquiring a 50% interest in Rand and the right to nominate one member of Rand's board of directors, and they did appoint Martin Bell as a director.

39.    Plaintiffs were induced to enter into the Agreement and to purchase stock of Rand based on Slaine's and Danziger's representations that, utilizing their experience expertise and business contacts in the information/ publishing industry they would pursue

16

investments in information/publishing and particularly in niche publishing, for the benefit

of plaintiffs as shareholders in Rand. Slaine and Danziger had made such representations

in personal, face-to-face meetings and in telephone calls with plaintiffs throughout the

latter half of 1993 in order to solicit their investment in Rand. These representations were

made in late 1993 while Slaine and Danziger were seeking to have the individual plaintiffs

invest $3.6 million in Rand which was at that time exclusively owned by Slaine and

Danziger (Exhibit A). Statements were made both in personal meetings and in telephone

conversations to Martin Bell, J. Morton Davis and Richard Elkin.

40.     Pursuant to the Agreement, defendant Slaine retained 72 shares of Rand and

his friend and associate, defendant Danziger retained 72 shares as well. Slaine and

Danziger thus each held 25% of Rand's outstanding shares, and, together, held 50%, of

Rand's outstanding shares and thus controlled Rand.

41.     That Slaine and Danziger understood they were to seek niche publications

for Rand is made clear in the quarterly reports to the shareholders about their purported

pursuit of corporate opportunities for Rand in the publishing field. Each of these

communications confirmed that Rand's line of business was the development and

acquisition of publishing and information database companies.

42.     In the first such report, for example, dated April 21, 1994, Slaine and Danziger

wrote to Rand's outside director about the launch of Hospitality Data Systems, a business

17

"compiling a database of companies and associations that regularly hold conferences and

other meetings." (Exhibit B).

    43.    On June 30, 1994, Slaine wrote in his quarterly report about the dimming

prospects for Financial Technology Review (Rand's then only existing publication) and his

recommendation not to continue that business and instead make new investments in

publishing and information database companies. Slaine wrote: "We are also aggressively

pursuing acquisitions."

    44.    On July 18, 1994, Slaine wrote to confirm that publication of Financial

Technology Review had been suspended. He also wrote:

> Our search for acquisition continues. Interestingly enough, two
> of the deals we turned down were subsequently acquired by
> John Wiley & Sons [an information/ publishing company]. I
> am glad to have higher standards than they!

    45.    On January 30,1995, Slaine and Danziger jointly wrote Rand's investors,

reporting that Hospitality Data Services "has made significant progress". They also wrote:

> In the meantime, we have invested $1.25 mm of our [Rand's]
> remaining unspoken for cash in the partial purchase of
> Progressive Grocer Associates (PGA). PGA publishes
> Progressive Grocer and Frozen Food Age magazines. We
> anticipate that this will be a very successful investment for
> Rand.

    46.    Slaine and Danziger failed to disclose at the time of this investment that Slaine

was chairman and a principal owner of PGA, thus beginning a pattern of duplicitous

behavior that would culminate in their misappropriating the IV opportunity for themselves.

    47.    On October 15, 1995, Slaine wrote in his report for the third quarter of 1995 that the PGA investment "performed well" but that Hospitality Data Services "had a difficult third quarter." Slaine wrote: "We have about S1.2M in cash and are reviewing, potential acquisitions, particularly in the soft-ware area."

    48.    For the year ended December 31, 1995, Slaine wrote to Rand investors that PGA was doing well and that HDS was approaching break-even cash flow. Slaine wrote that Rand still had $1.2 million in the bank: "So, financially we are in good shape and can make another significant investment, although nothing is imminent.

    49.    On April 15,1995, Slaine wrote that he and Danziger had decided to close down Hospitality Data Services, that PGA continues to do well, and that Rand was "also launching a new magazine in the retail technology field." Slaine reiterated that Rand still had $1.2 million cash.

    50.    On July 26,1996, Slaine wrote:

> Dear Rand Publishing Investor
>
> Enclosed are the financial statements for the first half of 1996.
>
> During the second quarter we terminated the operations of HDS [Hospitality Data Services], and the effect of this is included in the financial statements. Progressive Grocer Associates

> continues to progress and we are launching a
> new magazine - RT the Magazine of Retail
> Technology. We are very excited about the
> prospects of this new launch.
>
> We continue to look aggressively for
> opportunities to deploy our investments funds.
> <u>A major investment in a large Florida based
> publishing company was researched in great
> detail,</u> including significant due diligence by our
> accountants, but in the end we decided not to
> proceed.

51.    On October 24, 1996, while Slaine was already negotiating with Warburg to

join IV, a directly competing company to Rand, Slaine wrote to Rand investors:

> Mike Danziger and I have been active in
> pursuing investments for our remaining funds.
> We have been close on two occasions but haven't
> concluded a deal. Currently we are reviewing
> three investments in the newsletter, book, and
> electronic areas.

52.    Following the end of 1996, when Slaine had already joined IV, to conceal his

wrongful acts Slaine wrote to Rand investors:

> During the fourth quarter of 1996 Mike
> [Danziger] and I actively reviewed several
> acquisition investment candidates. The leading
> candidate was a company called Kleinrock that
> was an electronic publisher of tax and
> accounting information on CD Rom. This was a
> very profitable and growing business and we
> made a serious offer. We offered approximately
> $5,250,000 based on our cash position of
> $1,300,000 and a potential $4,000,000 loan
> commitment from State Street Bank. Despite

20

many rounds of negotiations we were in the end
outbid by two large publishing groups.

We also pursued an educational magazine
publisher called **Technology in Higher
Education.** In this case their [sic] were serious
management issues that proved to be an obstacle
during due diligence. Other investment
opportunities did not progress as far as those
mentioned above.

Mike [Danziger] and I continue to look for new
opportunities but are finding it ever harder to
locate and close on acquisitions and investments
in the information/ publishing areas given our
very limited cash resources. We are competing
with many companies with almost unlimited
resources.

53.    This was all willfully misleading since at that time Slaine with Danziger's
assistance, had already formed an arrangement with Warburg Pincus to form IHI's
predecessor, IV, which was a direct competitor to Rand, and did not reveal what entities
in the publishing business he was purchasing for IV.

54.    Danziger failed to correct the statements made by Slaine that Danziger and
Slaine were continuing to look for opportunities for Rand but could not find any, and failed
to reveal the formation of IV in December 1996 and the fact that Slaine was actively looking
for investment for IV rather than for Rand, and that Danziger was not looking for any
investments at all for Rand.

21

55.    Upon information and belief, although IV was formally formed in December 1996, Slaine and probably Danziger, had met with Warburg Pincus prior to that time to discuss forming the joint venture and thus the statements made by Slaine and Danziger some several months prior thereto, that no opportunities could be found for Rand, are also false.

56.    Slaine and Danziger failed to mention and concealed the fact that in January 1997, Information Ventures had successfully acquired CRC Press, located in Florida, from the Times Mirror Company.

57.    Slaine and Danziger had not brought the opportunity to Rand, although it clearly was within Rand's mandate. Instead, Slaine and Danziger had turned the opportunity to their own gain through IHI without disclosing this fact to Rand's shareholders.

58.    Slaine and Danziger's belated argument that Rand did not have sufficient funds to make certain investments is simply false since Rand had wealthy investors who were never asked or given the opportunity to put up more money, borrow funds, or as in the past if appropriate associate themselves with another investor or group of investors.

59.    Slaine wrote again to Rand investors following the close of the first quarter of 1997, saying:

> Mike and I continue to look for additional
> investments for Rand, but it remains very
> difficult given our limited cash position and the

22

> vast competition for investments in the
> information/ publishing industry.

60.     Again Slaine failed to disclose his formation of IV and his continuing

acquisitions in the information/ publishing industry for IV and his own profit rather than

for Rand, despite his duties as a director, officer and controlling shareholder of Rand.

61.     Slaine wrote to Rand investors on July 29,1997:

> There was little financial activity during this
> period. Mike [Danziger] and I, however, have
> looked at several investment opportunities and
> hopefully will find a suitable investment for our
> cash during the second half of 1997.

62.     Slaine once more failed to disclose his formation of IV and his continuing

acquisitions in the information/ publishing industry for IV and his own profit rather than

for Rand, despite his duties as a director, officer and controlling shareholder of Rand.

63.     During the first half of 1997, Slaine, with the assistance and at least

knowledge of Danziger – who concealed this information from the plaintiffs and Martin

Bell, the only independent director – had acquired for IV and for their own gain St. Lucie

Press, a publisher of professional titles, and Auerbach, a well-known provider of

technology-oriented print and electronic subscription-based products.

64.     In July 1997, Slaine, with the assistance, and at least knowledge of Danziger

– who concealed this information from the plaintiffs and Martin Bell, the only independent

23

shareholders did not believe it proper for them to invest in the IPO of IHI since this would put them into the same conflict of interest situation as Slaine and Danziger and they therefore declined the belated invitation to invest.

76.    It should be noted that Slaine acquired an interest in IHI for no more than $1.663 million which is now worth $70 million, and at the time of the IPO plaintiffs were belatedly offered a chance to invest at a price far above, approximately fifteen times, the price for which Slaine had acquired his interest.

### AS AND FOR A FIRST CAUSE OF ACTION
### AS AGAINST DEFENDANTS RAND, SLAINE AND DANZIGER

77.    Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

78.    This claim is brought derivatively by plaintiffs on behalf of Rand against Slaine and Danziger.

79.    In total disregard of their duties as directors, officers and controlling shareholders of Rand, for their own profit and gain, Slaine and Danziger usurped to themselves the corporate opportunities described above, failing to invest Rand's financial resources in these opportunities for the benefit of Rand's shareholders.

80.    Before commencing this action, plaintiffs did not make any demand upon the defendant corporation through its officers or board of directors that it commence an action against Slaine and Danziger because such demand would be futile and unavailing

27

inasmuch as, assuming Slaine and Danziger did not resign on September 11, 1998 as they claimed, Slaine and his business partner and associate, the co-defendant Danziger are the only officers of Rand, hold two of the three seats on Rand's board of directors, and are thus in control of Rand such that it would not bring an action against Slaine and Danziger. The only independent director of Rand, Martin Bell, has specifically authorized this lawsuit to be brought and to include both Slaine and Danziger as defendants.

81.     Plaintiffs have been injured as a result of Slaine's and Danziger's usurpation of corporate opportunities. Plaintiffs, as derivative representatives of Rand, seek all damages as permitted by law not to exceed $150 million, and other relief from defendants as hereinafter set forth.

**AS AND FOR A SECOND CAUSE OF ACTION**
**AS AGAINST DEFENDANTS RAND, SLAINE AND DANZIGER**

82.     Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

83.     This claim is brought derivatively by plaintiffs on behalf of Rand against Slaine and Danziger.

84.     As directors, officers and controlling shareholders of Rand, Slaine and Danziger were and are fiduciaries of Rand and of all of its shareholders and owed them the duty to conduct the business of Rand candidly, loyally, faithfully, fairly and diligently. These claims are asserted based on Slaine's and Danziger's acts in violation of applicable

state law and common law, which acts constitute gross, reckless and willful breaches of their fiduciary duties.

85.    Specifically, Slaine and Danziger owed Rand and plaintiffs as shareholders the duty to disclose conflicts of interest and to place the development and advancement of Rand above their own personal financial gain.

86.    In soliciting plaintiffs' investment, Slaine and Danziger had committed themselves to diligently investigating and acquiring interests in the information/ publishing industry. Utilizing their experience, expertise and business contacts in the information/ publishing industry to pursue investments in information/ publishing for the benefit of plaintiffs as shareholders of Rand was Slaine's and Danziger's fiduciary duty.

87.    Contrary to their commitment and representations and their fiduciary duties to plaintiffs as directors, officers and controlling shareholders of Rand, Slaine, with the assistance, aiding and abetting of Danziger, failed to disclose conflicts of interest, did not act with candor toward plaintiffs as shareholders of Rand, and failed to place the interests of Rand's shareholders and Rand above their own. Instead, as alleged herein, without disclosing to plaintiffs their wrongful activities, Slaine created or helped create a new investment vehicle for himself and Danziger in conjunction with Warburg Pincus and acquired businesses in the information/ publishing industry for their own gain that should have been acquired for Rand.

29

88.     By reason of the foregoing, Slaine and Danziger breached their fiduciary obligations to Rand and its shareholders.

89.     Plaintiffs have been injured as a result of Slaine's and Danziger's breach of their fiduciary obligations. Plaintiffs, as derivative representatives of Rand, seek damages and other relief for Rand as hereinafter set forth and to exclude Slaine and Danziger from any such recovery due to their fraudulent conduct and breach of their fiduciary duties.

### AS AND FOR A THIRD CAUSE OF ACTION
### AS AGAINST DEFENDANTS RAND, SLAINE AND DANZIGER

90.     Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

91.     This claim is brought derivatively by plaintiffs on behalf of Rand against Slaine and Danziger.

92.     All of Slaine and Danziger's shares in IHI, options and other benefits, be deemed to be held in constructive trust for the benefit of plaintiffs and that the defendants Slaine and Danziger be required to place all of their shares, options and other benefits, into a constructive trust for the plaintiffs" benefit.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AS AGAINST DEFENDANTS SLAINE AND DANZIGER

93.     Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

30

94.    Slaine and Danziger converted to themselves and for IHI and Warburg valuable assets rightfully belonging to Rand.

95.    Due to the defendants' conversion of these assets which included the purchase of niche publishing companies, and the obtaining of shares in IHI, Rand has been damaged.

96.    Among other things, Rand is entitled to recover the value of Slaine's and Danziger's shares in IHI, any benefits they received, and damages caused to Rand, to wit, the value of the niche publishing companies purchased and profits generated on them from the period they were obtained and into the future; the exact amount is not currently known to plaintiffs but it is believed to be in excess of $150 million.

97.    Plaintiffs are also entitled to recover whatever damages plaintiffs are able to prove after discovery has been had and the value of what the defendants converted has been revealed as well as punitive damages.

### AS AND FOR A FIFTH CAUSE OF ACTION
### AS AGAINST DEFENDANTS SLAINE AND DANZIGER

98.    Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

99.    Plaintiffs are seeking to have the Court appoint Martin Bell, the only independent and remaining director of Rand (Exhibit D) as a receiver for Rand.

31

100.    Upon the appointment of a receiver, plaintiffs are seeking to have Rand undergo a common law dissolution as being in the best interests of Rand once the litigation as against Slaine and Danziger and possibly others who may be responsible such as the attorneys for Rand who aided and abetted Slaine and Danziger in their fraudulent conduct, and/or IHI, has been resolved.

101.    Defendants Slaine and Danziger had previously sent out a notice seeking such a dissolution (Exhibit D); they have advised plaintiffs and the Court that the company Rand is now dormant and that Slaine and Danziger have resigned, and have further claimed that the company has suffered by reason of not being able to be dissolved.

102.    Despite this, Slaine and Danziger have done nothing since September 1998 to attempt to complete the dissolution of the company.

103.    By reason of the foregoing, plaintiffs are entitled to have Martin Bell appointed as a receiver, to have Rand dissolved following the termination of the litigation against Slaine and Danziger, and possibly IHI, the attorneys who aided and abetted Slaine and Danziger, as well as any others who may be found responsible.

104.    Plaintiffs are seeking a dissolution because of the oppressive conduct of Slaine and Danziger who have controlled Rand as against the plaintiff minority shareholders and thus a common law dissolution is being sought rather than a dissolution pursuant to the Business Corporation Law.

32

## AS AND FOR A SIXTH CAUSE OF ACTION
## AS AGAINST THE WARBURG PINCUS ENTITIES

105.    Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

106.    This claim is brought derivatively by plaintiffs on behalf of Rand against the Warburg Pincus entities.

107.    Warburg Pincus Ventures, LF was admittedly aware of Slaine's and Danziger's position with Rand and their obligations to the plaintiffs.

108.    Despite Warburg Pincus's admitted knowledge of the existence of a valid contract between Slaine and Danziger and the plaintiffs, the defendant sought to and did intentionally interfere with that contract.

109.    Warburg Pincus induced and conspired with Slaine and Danziger to breach their contract with and obligations to the plaintiffs. This is admitted by Sidney Lapidus, managing director of E.M. Warburg, Pincus & Co., LLC as confirmed by letter dated July 14,1998 (Exhibit J).

110.    As a result of the Warburg Pincus defendants' intentional and tortious interference with the plaintiffs' contract with Slaine and Danziger, that contract was caused to be breached and plaintiffs were caused to be damaged as aforesaid.

111.    Among other things, plaintiffs were deprived of their interest and benefit of IHI; these defendants' acts have now caused Rand to be, in essence, destroyed, and Slaine

33

and Danziger, Rand's key employees, to leave; future prospects for Rand have been destroyed; the benefits that the plaintiffs could receive from IHI and/or Rand have been destroyed; Rand has been deprived of the benefits of the companies purchased for IHI rather than for Rand; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

112.    The conduct of the Warburg Pincus entities and their agents was willful, deliberate and malicious and in violation of public policy and common decency, thus entitling the plaintiffs to recover punitive damages, all of which is not to exceed $500,000,000.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**AS AGAINST THE WARBURG PINCUS ENTITIES**

113.    Plaintiffs hereby repeat, reiterate and reallege each of the foregoing allegations with the same force and effect as if more fully set forth at length herein.

114.    That the Warburg Pincus entities conspired with and aided and abetted Slaine to defraud Rand and its shareholders.

115.    Knowing that Slaine was bound to Rand to purchase publications which were suitable for Rand, Warburg conspired with Slaine and assisted, aided and abetted him to purchase publications suitable for Rand for IV instead and for Slaine in return to become a substantial shareholder in IV, now known as IHI.

34

116.    Warburg failed to notify Rand or the plaintiffs of its arrangement with Slaine or to obtain its consent for that arrangement.

117.    With respect to another company known as "Fame" in which Warburg was involved with Slaine, they and Slaine sought to have the shareholders consent to have Rand invest in "Fame" in April 1998, to thus further conceal Warburg's relationship with Slaine with respect to IV.

118.    Had Warburg revealed its relationship with Slaine and that Slaine and Warburg were depriving Rand of the opportunity to purchase certain publications which Slaine was purchasing for IV, Rand would have or could have taken action immediately upon becoming aware of this.

119.    As a result of the fraudulent conduct of Warburg in aiding and abetting Slaine, plaintiffs have been damaged in that among other things, plaintiffs were deprived of their interest and benefit of IHI; these defendants' acts have now caused Rand to be, in essence, destroyed, and Slaine and Danziger, Rand's key employees, to leave; future prospects for Rand have been destroyed; the benefits that the plaintiffs could receive from IHI and/or Rand have been destroyed; Rand has been deprived of the benefits of the companies purchased for IHI rather than for Rand; and plaintiffs have been otherwise damaged, all of which damages are continuing into the future.

120.    The conduct of the Warburg Pincus entities and their agents was willful, deliberate and malicious and in violation of public policy and common decency, thus

35

entitling the plaintiffs to recover punitive damages, all of which is not to exceed $500,000,000.

## Jury Trial Demanded

121.    Plaintiffs demand a trial by jury.

## Prayer for Relief

WHEREFORE, plaintiffs pray for judgment as follows:

(i)    That Slaine and Danziger be charged with any losses to Rand as a result of their malfeasance, bad faith, breach of trust, usurpation of corporate opportunities, and breach of fiduciary duties as set forth in the complaint.

(ii)    That a constructive trust for the benefit of plaintiffs be established upon any shares and all proceeds of Slaine and Danziger from the IPO of IHI and any sale of IHI stock thereafter, and an accounting required for any profits realized by Slaine and Danziger as a result of their wrongful actions, including but not limited to the usurpation of corporate opportunities as alleged herein; that Slaine and Danziger be precluded from participating in any recovery because of their fraudulent conduct and breach of their fiduciary duties;

(iii)    That Martin Bell the only remaining and independent director of Rand be appointed as receiver for Rand and upon such appointment Rand be dissolved, following the termination of this and other litigation on behalf of Rand arising out of said wrongful acts;

36

(iv)    That plaintiffs be awarded a judgment as against the Warburg Pincus entities of actual and punitive damages in an amount not to exceed the sum of Five Hundred Million Dollars ($500,000,000;

(v)    That plaintiffs be awarded their costs and disbursements in bringing this action, including reasonable attorneys' and experts' fees; and

(vi)    That the Court award such other and further relief as to this Court may seem just and proper.

Dated: New York, New York
       October 17, 2001

                              JAROSLAWICZ & JAROS, ESQS.
                              Attorneys for Plaintiffs
                              150 William Street
                              New York, New York 10038
                              (212) 227-2780

                              By: _____
                                        David Jaroslawicz

TO:

PILLSBURY WINTHROP, LLP
Attorneys for Defendant Rand
One Battery Park Plaza
New York, New York 10004-1490

GREENBAUM, ROWE, SMITH,
 RAVIN, DAVIS & HIMMEL, LLP
Attorneys for Defendant Danziger
Metro Corporate Campus One
P.O. Box 5600
Woodbridge, New Jersey 07095-0988

37

COLLAZO CARLING & MISH, LLP
Attorneys for Defendant Slaine
747 Third Avenue
New York, New York 10017

WILLKIE, FARR & GALLAGHER
Attorneys for Defendants Warburg Pincus and E.M. Warburg
787 Seventh Avenue
New York, New York 10019

Exhibit C

10-K 1 a2106388z10-k.htm 10-K

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

Commission file No. 1-14371

# INFORMATION HOLDINGS INC.
### (Exact name of registrant as specified in its charter)

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark whether the registrant (1) has filed reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

The Company regards its trademarks, copyrights, domain names, trade secrets and similar intellectual property as valuable assets and relies upon trademark and copyright laws, as well as confidentiality agreements with employees and others, to protect its rights. The Company pursues the registration of material trademarks and copyrights in the U.S. and, depending upon use, in some other countries. The Company believes it owns or licenses all intellectual property rights necessary to conduct its business. To the best of the management's knowledge, there are no threatened or pending legal proceedings or claims related to intellectual property that are likely to have, individually or in the aggregate, a material adverse effect on the Company's business, financial condition or results of operations.

**Environmental Matters**

The Company believes its operations are in compliance with all applicable foreign, federal, state and local environmental laws, as well as all laws and regulations relating to worker health and safety.

**Employees and Labor Relations**

As of December 31, 2002, the Company had 723 employees, consisting of 591 employees in the United States and 132 employees based in England and France. No employees are covered by collective bargaining agreements with labor unions. The Company believes that relations with its employees are good.

9

## Item 2.  *Properties*

The Company leases its corporate headquarters, which is located in Stamford, Connecticut, and leases additional office space for its primary domestic operating units in East Haven, Connecticut; Boca Raton, Florida; New York, New York; Southfield, Michigan; Nashville, Tennessee; Cupertino, California; and in Fort Washington, Pennsylvania. The Company also leases office space in several locations related to its European operations in England, including London, Bagshot and Putney, as well as office space in Paris, France. The Company leases warehouse space in Nashville, Tennessee for use by its Transcender unit and Lancaster, England for use by its CRC Press unit. The Company also contracts with third parties for warehousing and distribution services in Troy, Missouri and Andover, England for use by its CRC Press unit. The Company does not own any real property. The Company believes that its properties, taken as a whole, are in good operating condition and are suitable and adequate for current business operations, and that suitable additional or alternative space will be available at commercially reasonable terms for future expansion.

## Item 3.  *Legal Proceedings*

On December 5, 2002 Venturetek, L.P., Richard Elkin, Antoine Bernheim, Stacy Bernheim and Genstar, Ltd., derivatively as shareholders of Rand Publishing Co., Inc. ("Rand") and individually, on their own behalf (the "Plaintiffs") filed a complaint in the Supreme Court of the State of New York against IHI (the "IHI Action"). The complaint alleges that IHI's predecessor, Information Ventures LLC, fraudulently acquired assets or businesses, including businesses acquired prior to the Company's initial public offering in August 1998, that were corporate opportunities of Rand. The complaint also alleges that IHI's taking of the assets or businesses constitutes a "conversion." The Plaintiffs request that all of the IHI shares and options be held in constructive trust for the benefit of the Plaintiffs. The Plaintiffs also seek damages in an amount of approximately $750 million. IHI believes that each of the claims in the complaint is without merit and filed a motion to dismiss the complaint on February 14, 2003. IHI's motion to dismiss states that the complaint fails to state a cause of action against IHI and, even if it does, the claims are barred under the applicable statutes of limitation or on account of the Plaintiffs' laches.

The Company's President and Chief Executive Officer, Mason P. Slaine, and Michael E. Danziger, a member of the Company's board of directors, are named as defendants in a related action entitled *Venturetek, L.P., et al. v. Rand Publishing Co., Inc., et al.*, also currently pending in the Supreme Court of the State of New York (the "Rand Action"). As in the IHI Action, the Plaintiffs in the Rand Action, proceeding derivatively on behalf of Rand, allege that certain assets or businesses acquired by IHI, including businesses acquired prior to the Company's initial public offering in August 1998, were corporate opportunities usurped from Rand. Plaintiffs allege that Slaine and Danziger breached fiduciary duties allegedly owing to Rand by allowing IHI's predecessor, Information Ventures LLC, to acquire those businesses. Plaintiffs seek, among other remedies, the imposition of a constructive trust over Slaine's and Danziger's shares of IHI as well as compensatory damages against

Slaine and Danziger in an amount alleged to be in excess of $150 million.

From time to time, the Company is a party to other lawsuits and administrative proceedings that arise in the conduct of its business. While the outcome of these lawsuits and proceedings cannot be predicted with certainty, management believes that, if adversely determined, the lawsuits and proceedings, either singularly or in the aggregate, would not have a material adverse effect on the financial condition, results of operations, or net cash flows of the Company.

### Item 4.  *Submission of Matters to a Vote of Security Holders*

No matters were submitted to a vote of security holders during the fourth quarter of 2002.

10

## PART II

### Item 5.  *Market for the Registrant's Common Equity and Related Stockholder Matters*

The Company's common stock is listed on the New York Stock Exchange (NYSE) under the symbol "IHI". As of March 14, 2003, there were approximately 2,424 holders of the Company's common stock comprised of 24 record holders and approximately 2,400 beneficial holders. The following table reflects the high and low closing sales prices of the Company's common stock as reported by the NYSE, for the periods indicated.

| Common Stock | 2002 | | | | 2001 | | | |
|---|---|---|---|---|---|---|---|---|
| | High | | Low | | High | | Low | |
| First Quarter | $ | 29.39 | $ | 24.23 | $ | 27.25 | $ | 19.20 |
| Second Quarter | | 31.80 | | 23.34 | | 32.30 | | 19.85 |
| Third Quarter | | 23.75 | | 17.53 | | 33.75 | | 17.65 |
| Fourth Quarter | | 22.56 | | 12.25 | | 29.83 | | 18.30 |

### Dividend Policy

The Company has never paid a dividend on its common stock and does not anticipate paying any dividends on its common stock in the foreseeable future. The current policy of the Company's Board of Directors is to retain earnings to finance the operations and expansion of the Company's business. Prior to its termination in March 2003, the Company's Credit Facility restricted the ability of the Company to pay dividends.

### Changes in Securities and Use of Proceeds

The following report relates to the Company's secondary public stock offering:

| | | |
|---|---|---|
| Commission file number of registration statement: | | 333-30202 |
| Effective Date: | | March 14, 2000 |
| Expenses incurred through December 31, 2002: | | |
| Underwriting discounts | $ | 8,595,000 |
| Other expenses | $ | 522,000 |
| Total expenses | $ | 9,117,000 |
| Application of proceeds through December 31, 2002: | | |
| Acquisitions of businesses, titles and equity interests | $ | 147,827,000 |
| Temporary investments | | |
| (Commercial paper and money market funds) | $ | 7,173,000 |

Exhibit D

2                                                               Equity**HP**

**CLOSE/PRICE**                                                  Page  1 / 2
INFORMATION HOLDINGS INC (724309Q US)        (Not Quoted)
                                              HI 13.25      ON  8/20/98
Range ▓▓ ▓▓ to ▓▓ ▓▓     Period  Daily        AVE 10.8308   VL   44230
                         Market  Trade        LOW 8.50      ON  9/ 3/98

|   | DATE  | PRICE   | VOLUME |   | DATE  | PRICE   | VOLUME |   | DATE  | PRICE   | VOLUME |
|---|-------|---------|--------|---|-------|---------|--------|---|-------|---------|--------|
| F |       |         |        | F | 11/13 | 10.4375 | 800    | F | 10/23 | 9.875   | 800    |
| T |       |         |        | T | 11/12 | 10.4375 | 3900   | T | 10/22 | 9.875   | 3400   |
| W |       |         |        | W | 11/11 | 10.3125 | 86700  | W | 10/21 | 10.00   | 2100   |
| T | 12/ 1 | 10.75   | 31600  | T | 11/10 | 10.875  | 5200   | T | 10/20 | 10.125  | 1300   |
| M | 11/30 | 10.125  | 96200  | M | 11/ 9 | 10.875  | 12200  | M | 10/19 | 10.375  | 3200   |
|   |       |         |        |   |       |         |        |   |       |         |        |
| F | 11/27 | 9.6875  | 600    | F | 11/ 6 | 10.4375 | 4500   | F | 10/16 | 10.625  | 400    |
| T | 11/26 |         |        | T | 11/ 5 | 10.4375 | 5800   | T | 10/15 | 10.625  | 5400   |
| W | 11/25 | 9.6875  | 5100   | W | 11/ 4 | 10.3125 | 9400   | W | 10/14 | 10.75   | 1200   |
| T | 11/24 | 9.625   | 1800   | T | 11/ 3 | 9.75    | 66900  | T | 10/13 | 10.625  | 100    |
| M | 11/23 | 9.625   | 34900  | M | 11/ 2 | 10.00   | 4300   | M | 10/12 | 10.625  | 20500  |
|   |       |         |        |   |       |         |        |   |       |         |        |
| F | 11/20 | 9.625   | 5800   | F | 10/30 | 10.25   | 1600   | F | 10/ 9 | 10.875  | 1300   |
| T | 11/19 | 9.50    | 14300  | T | 10/29 | 10.00   | 1700   | T | 10/ 8 | 11.3125 | 14900  |
| W | 11/18 | 10.3125 | 3000   | W | 10/28 | 10.00   | 1200   | W | 10/ 7 | 12.625  | 20400  |
| T | 11/17 | 10.125  | 61000  | T | 10/27 | 10.00   | 2000   | T | 10/ 6 | 10.6875 | 2700   |
| M | 11/16 | 10.50   | 4200   | M | 10/26 | 10.375  | 3400   | M | 10/ 5 | 10.6875 | 6600   |

**Bloomberg**
TERMINAL

\<HELP\> for explanation.                                    Equity**HP**

**CLOSE/PRICE**                                             Page  2 / 2
INFORMATION HOLDINGS INC (724309Q US)          (Not Quoted)

|   |   |   |   |   |   |   |   | HI 13.25 | ON | 8/20/98 |
|---|---|---|---|---|---|---|---|---|---|---|
Range to — Period Daily, Market Trade. AVE 10.8308 VL 44230. LOW 8.50 ON 9/ 3/98

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 10/ 2 | 10.8125 | 2100 | F | 9/11 | 10.875 | 16700 | F | 8/21 | 12.9375 | 232600 |
| T | 10/ 1 | 10.75 | 12400 | T | 9/10 | 10.50 | 12400 | T | 8/20 | H13.25 | 63400 |
| W | 9/30 | 10.625 | 90300 | W | 9/ 9 | 10.0625 | 4100 | W | 8/19 | 13.25 | 20900 |
| T | 9/29 | 10.875 | 2600 | T | 9/ 8 | 9.4375 | 7500 | T | 8/18 | 13.125 | 30200 |
| M | 9/28 | 11.00 | 4700 | M | 9/ 7 | | | M | 8/17 | 13.0625 | 51500 |
| F | 9/25 | 10.875 | 49400 | F | 9/ 4 | 9.0625 | 18200 | F | 8/14 | 13.1875 | 114400 |
| T | 9/24 | 11.375 | 2900 | T | 9/ 3 | L8.50 | 27100 | T | 8/13 | 12.625 | 73200 |
| W | 9/23 | 11.375 | 4400 | W | 9/ 2 | 8.875 | 38900 | W | 8/12 | 12.3125 | 33700 |
| T | 9/22 | 10.625 | 3300 | T | 9/ 1 | 10.00 | 35700 | T | 8/11 | 12.4375 | 159000 |
| M | 9/21 | 10.75 | 1300 | M | 8/31 | 9.50 | 10200 | M | 8/10 | 12.25 | 159000 |
| F | 9/18 | 11.00 | 29300 | F | 8/28 | 10.25 | 16400 | F | 8/ 7 | 12.0625 | 1566600 |
| T | 9/17 | 11.375 | 17000 | T | 8/27 | 11.00 | 38000 | T | 8/ 6 | 12.00 | |
| W | 9/16 | 11.625 | 9400 | W | 8/26 | 12.375 | 34100 | | | | |
| T | 9/15 | 11.4375 | 12100 | T | 8/25 | 12.875 | 34300 | | | | |
| M | 9/14 | 11.1875 | 6500 | M | 8/24 | 12.875 | 28700 | | | | |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2007 Bloomberg Finance L.P.
07-Dec-2007 10:24:57

**Bloomberg**
TERMINAL

